## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LINDA GUSTITUS, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No._____ |
| | ) | |
| ANTHONY WILLIAMS, ET AL. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MOTION FOR A  PRELIMINARY INJUNCTION UNDER FEDERAL RULE OF CIVIL PROCEDURE 65(a)

Plaintiffs, by and through their counsel, respectfully move this Court for a preliminary injunction against the Defendants under Fed. R. Civ. Pro. 65(a), for the reasons set forth in the accompanying Memorandum of Points and Authorities.

On: _5/2/06_____

Respectfully submitted,

By: _Christopher A. Mohr_
Christopher A. Mohr
D.C. Bar No.  458599
Michael R. Klipper
D.C. Bar No.  166074

Meyer, Klipper & Mohr, PLLC
923 Fifteenth Street
Washington, D.C. 20005
Voice: 202-637-0850
Fax: 202-637-0851

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| LINDA GUSTITUS, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| ANTHONY WILLIAMS, ET AL. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN**
**SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION**

**INTRODUCTION**

This case involves one of the most fundamental of First Amendment freedoms: the right of individuals to engage in protected speech on their own private property. "A special respect for individual liberty in the home has long been part of our culture and our law; that principle has special resonance when the government seeks to constrain a person's ability to *speak* there." *Ladue v. City of Gilleo,* 512 U.S. 43, 58 (1994) (internal citation omitted) (emphasis in original).

The capital of a nation that has affirmed, time and again, its "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times v. Sullivan,* 376 U.S. 254, 270 (1964), prohibits its residents from erecting signs protesting government action on their own private property without prior government approval, on pain of civil fines and incarceration. *See* D.C. Code §§ 6-1406 (a), (c), (d) (any violation of building code punishable by 10 days in jail;

prosecuted by the attorney general); D.C. Mun. Regs. tit. 12, §§ 3107.9.1; 3107.9.5.[1]
Before erecting a residential protest sign, that sign must be cleared by a government
official who determines whether its content relates to "public information." *See* 12
D.C.M.R. § 3107.9.5.1. The District of Columbia's municipal regulations contain a
labyrinth of overlapping (and occasionally conflicting) signage restrictions and
exceptions, none of which apply to the signs the plaintiffs have erected. *See, e.g.,* 12
D.C.M.R. §§ 3107.3 (all signs banned unless under one square foot, otherwise exempted,
or permit obtained); 3107.3.5 (exemptions, none of which apply to protests); 3107.6.1
(banning all signs unless exemptions or permit section applies), 3107.6.3 (banning all
"miscellaneous" signs); 3107.7.7 (banning all signs on the sides of buildings); 3107.9.1
(banning all residential signs without permits); 24 D.C.M.R. § 108 (permitting certain
political and crime prevention signs in public space).

 As discussed in more detail below, the plaintiffs in this case have been
unconstitutionally threatened with civil fines, and the possibility of criminal prosecution
for placing protest signs in their front lawns.   They have repeatedly and unsuccessfully
tried to obtain permits for their signs.   One plaintiff has elected not to speak at all
because of the burden of compliance with the District's regulatory arcana and her fear of
government sanction. The District's regulatory attempt to limit its residents' First
Amendment protests violates the most basic free speech principles.

---

[1] All citations to the D.C. Municipal Regulations are hereinafter referred to by [title] D.C.M.R. [section].

## STATEMENT OF FACTS

Plaintiffs ("the neighbors") are residents of Washington D.C., and live on the 4700 block of Ellicott Street, NW, which has been zoned as residential. (*See* Compl. ¶ 10; Ex. H.) All of the neighbors chose to live in this locale because of the spaciousness of the yards and the distance between houses, which is dictated by the D.C. Zoning regulations. (*See* Gustitus Aff. ¶ 4; McBride Aff. ¶ 4; Parenti Aff. ¶ 4; Ramoy Aff. ¶ 4.)

Sometime in early 2006, a developer bought the house at 4717 Ellicott Street NW. (*See* Ex. F) After receiving a decision from the District Government allowing him to subdivide the property into two buildable lots, (see Parenti Aff. ¶ 4; Ex. F; Ex. G),[2] the developer has indicated that he intends to sell each of those lots individually, resulting in two houses being built close together where one house currently sits. (*See* Ex. F; Ex. G; Ex. H.) After learning of the zoning variance and the developer's plans, the neighbors became concerned about maintaining the current aesthetic character of their neighborhood. (*See* Gustitus Aff. ¶ 4; McBride Aff. ¶ 4; Parenti Aff. ¶ 4; Ramoy Aff. ¶ 4.) The neighbors tried to meet with the developer to discuss his plans for the lot, but he refused to meet with them. (*See* Ex. F.) The neighbors then put up signs in their yards with messages such as "KEEP THE PARK IN AU PARK," "SAVE AU PARK, NO SPLIT LOTS," and "SAVE AU PARK, NO MCMANSIONS," in protest of the zoning board decision and the developer's plans. (Gustitus Aff. ¶ 2; McBride Aff. ¶ 2; Parenti

---

[2]    The Zoning Administrator's decision grants the developer a variance from the 50-foot lot width requirement for properties zoned "R-1-B," which is the zoning designation for all of the properties on Ellicott Street, NW, and the surrounding residential neighborhoods. (Gustitus Aff. ¶¶ 3-4; McBride Aff. ¶¶ 3-4; Parenti Aff. ¶¶ 3-4; Ramoy Aff. ¶¶ 3-4.) The variance allows the property at 4171 Ellicott Street, NW to be split into two flag-shaped lots, which allows for the development of two houses, one in front of the other, where one house currently sits. (Gustitus Aff. ¶ 4; McBride Aff. ¶ 4; Parenti Aff. ¶ 4; Ramoy Aff. ¶ 4.) These two subdivided lots would each have lot widths of less than 50 feet, in violation of the zoning regulations for R-1-B properties. (*Id.*); 11 D.C.M.R. § 401.3.

Aff. ¶ 2; Ramoy Aff. ¶ 2.)[3]  Pictures of each of the neighbors' signs are attached to their

respective affidavits.  The recent "McMansionization" of the D.C. Metro area has been a

matter of considerable public concern and debate.[4]

On March 4, 2006, three of the neighbors each received a Notice of Violation

(NOV) from the District of Columbia's Department of Consumer and Regulatory Affairs

(DCRA), which cited them for violations of title 12 of the District's municipal

regulations, 12 D.C.M.R. § 101 *et seq.* (the "Building Code") for having signs in their

yard without permits.  The NOVs threatened civil fines of $2,000, as well as the

possibility of criminal prosecution.[5]  (*See, e.g.,* Gustitus Aff. ¶ 6 & Attach. 1; McBride

Aff. ¶ 6 & Attach. 2; Parenti Aff. ¶ 6 & Attach. 2; Ramoy Aff. ¶ 6 & Attach. 2.)  After

receiving the notices, individual neighbors have tried multiple times to obtain permits—

without success.  (Gustitus Aff. ¶¶ 7, 12-21; Parenti Aff. ¶¶ 7, 9; Ramoy Aff. ¶¶ 7, 9.)

First, on March 13, 2006, Ms. Parenti, on behalf of herself and Ms. Ramoy,

visited the DCRA's offices to obtain a permit.  (Parenti Aff. ¶ 7.)  After some confusion

on the part of DCRA staff about whether a permit was necessary, she was informed that a

permit was needed and that she would have to obtain a plat of her property, which would

---

[3]    The signs are made of plywood and black paint; they contain no profanity, nor do they mention
the developer.  (See Gustitus Aff. ¶ 2; McBride Aff. ¶ 2; Parenti  Aff. ¶ 2; Ramoy Aff. ¶ 2.)

[4]    *See, e.g.,* Annie Gowen, *Arlington Board Votes to Rein In House Sizes,* Wash. Post, Nov. 16,
2005, at B1; Editorial, *McMansions: Time to Mind Our Manors,* Wash. Post, Oct.30, 2005, at B8; Annie
Gowen, *Home Size Builds to Crescendo,* Wash. Post, Oct. 27, 2005, at T14; Cameron Barr, *Town Tries to
Stop March of the Mansions,* Wash. Post, Aug. 3, 2005, at B1.

[5]    The NOVs issued to the neighbors indicate a potential fine of $2,000 and also recite D.C. Code §
42-3131.01(a), which states, in relevant part:

> the correction of any condition aforesaid [e.g., violation of the building code] . . . shall
> not relieve the owner of the property on which such condition existed, or from which
> such conditions arose, from criminal prosecution and punishment for having caused or
> allowed such unlawful condition to arise or for having failed or refused to correct the
> same.

*See* Gustitus Aff. Attach. 2; McBride Aff. Attach. 2; Ramoy Aff. Attach. 2.)

take no less than four days. (*See id.*) As the plat would not arrive before the expiration

of the 15-day deadline specified in the NOV, it would have been impossible for her to

obtain a permit within the time specified for compliance. (*See id.*) Ms. Parenti and Ms.

Ramoy therefore sent a joint letter to DCRA on March 17, 2006, contesting the NOV and

asking for a hearing. (Parenti Aff. ¶ 8; Ramoy Aff. ¶ 8.) Ms. Ramoy delivered that letter

to the DCRA by hand, and tried again to obtain a permit for her sign. (Ramoy Aff. ¶ 9.)

She was told at that time that the sign was illegal and that she had to take it down. (*Id.*)

She was unable to obtain a permit or any information on how to get one. (*Id.*) The sign

remains up in her yard. (*Id.* ¶ 11.)

The second neighbor fared no better. (*See* Gustitus Aff. ¶ 12-21.) In response to

her NOV, Ms. Gustitus went on-line to the DCRA web site, downloaded a "Sign Permit

Application," and filled it out. (Gustitus Aff. ¶ 7.) She then called Olgie Antoine, the

DCRA inspector that had issued the NOV. (*Id.*) Mr. Antoine told Ms. Gustitus that

although the Building Code citation in the NOV was incorrect, she still needed a permit

pursuant to a different Building Code section. (*Id.*) Ms. Gustitus told him that she

needed to know the proper Code citation, because the Notice of Violation indicated the

possibility of a $2,000 fine. (*Id.*) He said he would call her back with the correct Code

cite. (*Id.*)

On March 20, 2006, after having been ill with the flu for over a week, Ms.

Gustitus realized that the NOV's 15-day period for compliance had just expired. (*Id.*

¶ 8.) She called Mr. Antoine twice, leaving messages, but was unable to reach him. (*Id.*)

That same day, she sent a letter asking for a grace period from the 15-day requirement

because of her illness and because of Mr. Antoine's statement that the Code citation on

the Notice was incorrect and his failure to call her back with the proper statutory reference. (*Id.*) Included with this letter was a completed permit application and request for a hearing. (*See* Gustitus Aff. Attach. 2.)

The next day, Ms. Gustitus reached Mr. Antoine and she again asked him for the proper Building Code citation. (Gustitus Aff. ¶ 9.) He responded that he had left the information with David Griff, another resident on the block, and asked him to inform other people on the street who might be interested.[6] (*Id.*) Mr. Antoine eventually told Ms. Gustitus the "proper" Code citation (12 D.C.M.R. § 3107.9.1), and informed her that she could file for a permit for the sign at DCRA by providing a plat of her property and 3 drawings of the sign. (Gustitus Aff. ¶ 11.)

On March 24, 2006, Ms. Gustitus went to visit the DCRA's Surveyor's office at 941 North Capitol Street, N.E., Second Floor, and ordered one plat with three properties on it—her house and that of two adjacent tracts. (*Id.* ¶ 12.) The clerk informed her that the plats would be ready in a week and that she should call the following Thursday. (*See id.*) After ordering the plat, she then went to the DCRA Building and Land Regulations office to obtain a sign permit. (*Id.* ¶ 13.) The clerk in the permit office then asked her to tell him about the sign, and she described her sign and its contents as well as that of another sign for which she was also going to be applying for a permit. (*Id.* ¶ 16.)

The clerk asked Ms. Gustitus to wait, and, upon his return, informed Ms. Gustitus that the signs were illegal and that she could not get a permit for them. (*Id.* ¶¶ 17-18.) When she asked him why, the clerk pointed to two sections of the Code, sections

---

[6]    There may have been some confusion on Mr. Antoine's part about Ms. Gustitus's address. (*See* Gustitus Aff. ¶ 11.)

3107.6.6 ("Directional Signs") and 3107.9.5.1 ("Public Information"). (*Id.*) Ms. Gustitus, an attorney, read them and said that her signs were not "directional signs" and that it looked to her as if "public information" signs may receive permits, but the clerk remained unswayed. (*Id.*) Ms. Gusitis said she wanted to apply for a permit anyway, so he gave her three copies of the one-page sign permit application that she had already downloaded. (*Id.*).

Ms. Gustitus' next stop was DCRA's Building and Land Regulations office to file the permit application that Ms. Ramoy and Ms. Parenti had completed and asked Ms. Gustitus to file for them. (*Id.* ¶ 19) When informed that the responsible employee, "Bill" was not in, Ms. Gustitus left Ms. Ramoy's and Ms. Parenti's application at the office with the understanding that DCRA would contact them. (*Id.*) Having spent roughly two and one-half hours on this endeavor, she left. (*Id.* ¶¶ 12-19.) On March 20th, she mailed in an application. (*Id.* ¶ 21).

On April 5, 2006, Ms. Gustitus returned to the Surveyor's office, picked up the plats she had ordered, and filed a sign permit application with a plat of her property and three copies of a drawing of her sign, as she had been instructed by Mr. Antoine. (Gustitus Aff. ¶¶ 11, 20.) On April 7, she received the original sign permit that she had mailed to the DCRA on March 20th with a blank "Application for Construction Permits on Private Property," without any accompanying letter or explanation. (*Id.* ¶ 21 & Attach. 4.)

Mr. McBride, after learning of Ms. Parenti's trying experience at the DCRA offices, did not bother with trying to get a permit, but just requested a hearing on the

matter. (McBride Aff. ¶ 8.)  In addition, Ms. Todd, who was about to put up her own

sign, refrained from doing so upon learning of her neighbors' NOVs. (Todd Aff. ¶¶ 7-9.)

None of the neighbors have permits, and their signs remain up in violation of the

Building Code and in derogation of the NOVs. (Gustitus Aff. ¶ 21; McBride Aff. ¶ 10;

Parenti Aff. ¶ 10; Ramoy Aff. ¶ 10.)  All of the signs are larger than one square foot.

(Gustitus Aff. ¶ 2; McBride Aff. ¶ 2; Parenti Aff. ¶ 2; Ramoy Aff. ¶ 2.)  All of the

neighbors fear civil fines and criminal prosecution, and one neighbor has been afraid to

put up a sign at all. (Gustitus Aff. ¶ 23; McBride Aff. ¶ 11; Parenti Aff. ¶ 11; Ramoy

Aff. ¶ 12; Todd Aff. ¶¶ 8-10.)  When questioned about the NOVs by the press, Linda

Argo, a DCRA spokesperson, simply responded that "[t]he signs in their yards don't

comport with the building code." (Ex. F.)[7]  Ms. Argo also indicated that the District's

law permitted yard signs for political candidates, but not the signs that the neighbors had

erected. (Ex. F).  She also suggested that protests and candidates could not appear on the

same sign, as that sent "mixed messages." (*See id.*)

---

[7]      Prior to the initiation of this lawsuit, on or about March 22, counsel contacted Mr. Lennox
Douglas, acting administrator of DCRA's Building and Land Administration to attempt to resolve the
neighbors' concerns.  That call was never returned.  Next, on April 5, 2006, counsel for the neighbors
contacted Assistant Attorney General Ridley by phone, informed him that he represented the neighbors in
the Washington Post article attached hereto as Exhibit F, and asked him who he needed to talk to about
securing a promise by the DC government not to enforce its Building Code against these people while the
constitutional problems were resolved by the Council.  Assistant Attorney General Ridley referred counsel
to David Rubenstein, Acting General Counsel of DCRA.  Counsel then contacted Mr. Rubenstien by voice
mail and email.  That email cited the *Ladue* and *Saia* cases as the basis of the neighbors' constitutional
complaints with the Building Code, and asked that the DC government not enforce these regulations while
the Council sought repeal, and asked for a meeting with him so that the neighbor's constitutional concerns
could be set out in more detail.  On 6 April, Mr. Rubenstein stated that he was familiar with the cases cited
in counsel's email, but refused either to meet with the neighbors or counsel or refrain from enforcement of
the NOVs. He did say that counsel for the neighbors should feel free to submit whatever he wished in
writing.  Given (a) the outstanding NOVS against the neighbors and the fact that three of them had already
requested hearings, (b) the DCRA's non-responsiveness to the neighbors' requests, and (c) the silencing of
Ms. Todd's speech, this lawsuit followed.  Should the Court desire copies of counsel's emails, counsel will
gladly provide them.

8

### Statutory Framework of the Building Code

The municipal regulations at issue in this case (12 D.C.M.R. § 101 *et seq.*) were not actually written by the District of Columbia's elected representatives. Like many jurisdictions, rather than draft its own building code, the District of Columbia has outsourced the writing of its building code—including its sign regulations—to a private organization, and given the mayor authority to enforce them. D.C. Code §§ 6-1401(4), (12) (defining, respectively, "construction" and "model" codes); 6-1402 (adopting code); 6-1405.01 (a), (d) (granting authority to enforce to the Mayor or his designee, and delegating the administration of those codes to the director of the District's Department of Consumer and Regulatory Affairs).[8] When the International Code Council (ICC) makes changes to those codes, they become law by default. The mayor must propose the amendments to the City Council, D.C. Code § 6-1409(b), and then the Council has a 45-day review period; but if the Council does not approve, disapprove, or amend the new provisions, the IBC's changes are deemed approved by the Council and acquire the force of law. D.C. Code § 6-1409. The regulations at issue in this case became law on January 9, 2004. 51 D.C. Reg. 292 (Jan. 9, 2004).[9]

---

[8]    The District's building code was drafted by the International Code Counsel (ICC). *See* 51 D.C. Reg. 292 (Jan. 9, 2004) (enacting 2003 Building Code); 50 D.C. Reg. 6454 (Aug. 8, 2003) (proposing 2003 Building Code). The ICC was founded by Building Officials and Code Administrators International, Inc. (BOCA), International Conference of Building Officials (ICBO), and Southern Building Code Congress International, Inc. (SBCCI). *About ICC, at* http://www.iccsafe.org/news/about/. The ICC's predecessor organization, SBCCI, has been described as consisting of "members from government bodies, the construction industry, business and trade associations, students, and colleges and universities." *Veeck v. S. Bldg. Code Cong. Int'l*, 293 F.3d 791, 793 (5th Cir. 2002); *see also Int'l Code Council, Inc. v. Nat'l Fire Prot. Ass'n*, 2006 U.S. Dist. LEXIS 13783, at *2-6 (N.D. Ill. Mar. 27, 2006).

[9]    The regulations are available online at http://dcra.dc.gov/dcra/frames.asp?doc=/dcra/lib/dcra/information/forms_docs/pdf/dcmr12.pdf&open=|33466|.

The District of Columbia Building Code Supplement of 2003, codified at 12

D.C.M.R. § 101 *et seq.* ("Building Code"), governs the "construction, reconstruction,

alteration, addition, repair, removal, demolition, use, location, occupancy, and

maintenance of all buildings, structures, signs, advertising devices, and premises in the

District." D.C. Code § 6-1403(a)(1).[10]  The stated intent of the Code is to

> ensure public safety, health and welfare by building construction, through
> structured strength, energy and water conservation, accessibility to the physically
> handicapped, adequate egress facilities, sanitary equipment, light, ventilation and
> fire safety; and, in general, the secure safety to life and property from all hazards
> incident to the design, erection and repair, removal, demolition, or use and
> occupancy of buildings, structures, or premises.

*Id.* § 6-1404.

Neither the Building Code nor its enabling statute mentions aesthetics or traffic control in

their statements of intent.

The neighbors face significant penalties for violation of the sign provisions. *Any*

violation of the Building Code may be enforced either civilly pursuant to the

administrative enforcement provisions of the D.C. Code, see *id.* § 6-1406(c), or

criminally, via fines of up to $2000 and ten days imprisonment, *id.* § 6-1406(a).  In

addition, the mayor may, at his discretion, deny a building permit (for unrelated projects)

to a convicted Building Code violator for a period of three years after the finding of a

violation. D.C. Code § 6-1407.01(3).  Finally, the regulations also unequivocally instruct

reviewing courts and officials that they are to be construed severely.  "When different

sections of this code specify different requirements for the same specific case, the most

---

[10]      The regulations do not define the term "sign," but the D.C. Code defines it as "a name,
identification, description, display, or illustration which is affixed to, or represented directly or indirectly
upon a building, structure, or piece of land and which directs attention to an object, product, place, activity,
person, institution, organization, or business." D.C. Code § 22-3312.05(10).

restrictive shall govern.  When there is a conflict between a general requirement and a specific requirement, the specific requirement shall be applicable." 12 D.C.M.R. § 102.1.

## SUMMARY OF ARGUMENT

A District resident who wishes to place a yard or window sign saying "IMMIGRANT RIGHTS NOW," "SUPPORT OUR TROOPS," or "WAR IS NOT THE ANSWER" must comply with a regulatory maze.  She must submit a permit application (in triplicate), accompanied by a plat of her property and scale drawings of the proposed sign *before* putting up the sign. (*See* 12 D.C.M.R. §§ 3107.9.1; 3107.3.1; Gustitus Aff. ¶ 11; Parenti Aff. ¶ 7; Ramoy Aff. ¶ 7.)  Those residents who do not have a plat of their property must wait, on average, about a week to obtain that plat before they can even apply for a permit. (*See* Gustitus Aff. ¶ 12; Parenti Aff. ¶ 7; Ramoy Aff. ¶ 7.)  Then the resident must wait—for an undetermined period—while her permit application is reviewed by a public official who will determine whether the sign relates to "public information," or, in the alternative, is "unusual," of a type "infrequently encountered," *and* "will aid in the promotion of an activity that is *exclusively* civic in nature." *See, e.g.,* 12 D.C.M.R. §§ 3107.9.1, 3107.9.5.1 (residential permit); 3107.6.7 (special permit exemption) (emphasis added); 105.3.1 (general building permit examination provision containing no time limit).  If a resident desired to hang such a sign on the side of their house (instead of placing it in their yard) she could not, because the permit process is unavailable in such instances. *Id.* § 3107.7.7.  Failure to obtain a permit can result in civil fines, criminal prosecution, and the denial of future building permits for renovations and other completely unrelated home improvement activities. DC Code §§ 6-1406(a), (c); 6-1407.01(3).  The overbreadth of the District's signage laws is stunning.

11

First, even assuming *arguendo* that the regulatory maze of overlapping signage restrictions in 12 D.C.M.R. § 3107 is content-neutral (and it is not), the Supreme Court's decision in *City of Ladue v. Gilleo*, 512 U.S. 43 (1994), renders its application to the neighbors invalid. As *Ladue* recognized, political speech via residential signs is a unique and venerable means of communication, receiving the highest level of First Amendment protection. *See id.* at 54. The government has no power to categorically prevent—or burden—speech of this nature. The distinction between banning all residential protest signs as was the case in *Ladue,* or rendering the display of such signs illegal without a permit (as the District has sought to do here) makes no constitutional difference. Either instance assumes—wrongly—that the government entity may penalize citizens for exercising their First Amendment rights at home. *Ladue* bars that degree of government intrusion.

Second, the District's permit requirement in and of itself places a burden on speech that the First Amendment prohibits. The idea that a resident must receive government permission before putting up a sign on his property offends long-held constitutional traditions. *See, e.g., Watchtower Bible and Tract Soc'y of N.Y. v. Village of Stratton,* 536 U.S. 150, 165-66 (2002).

Third, even if *Ladue* did not foreclose their enforcement, the standardless permit scheme renders the regulations facially unconstitutional. By its terms, the Building Code's licensing provisions require a government official to make several subjective judgments about the *content* of the signage, and to issue permits based on those content-based judgments (if, indeed, he ever issues permits at all). The First Amendment categorically prohibits government officials from exercising such boundless discretion

over communicative activity, and the presence of that discretion renders the permit

provisions facially invalid. *See, e.g., City of Lakewood v. Plain Dealer Publ'g Co.*, 486

U.S. 750, 756-57 (1988) (stating how the presence of unbridled discretion in government

officials constitutes a prior restraint); *Thornhill v. Alabama,* 310 U.S. 88, 97 (1935).

Finally, the Building Code's sign regulations are *not* content-neutral, and are

therefore subject to strict scrutiny. *See, e.g., Sugarman v. Village of Chester,* 192 F.

Supp. 2d 282, 299 (S.D.N.Y. 2002).


## ARGUMENT

## I.    The Neighbors Are Entitled to Preliminary Relief.

The neighbors are entitled to preliminary and emergency relief in this case. This

Court may issue emergency relief and a preliminary injunction under Fed R. Civ. P. 65(b) if

the neighbors can show:

> (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable
> injury if the injunction is not granted, (3) that an injunction would not substantially
> injure other interested parties, and (4) that the public interest would be furthered by the
> injunction.

*Adair v. England*, 217 F. Supp. 2d 1, 3 (D.D.C. 2002) (internal citations omitted).

Even minimal infringement of First Amendment values constitutes irreparable injury

sufficient to justify injunctive relief. *See Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965);

*Fehribach v. City of Troy*, 341 F. Supp. 2d 727, 733 (D. Mich. 2004) (issuing preliminary

injunction against enforcement of city ordinance limiting citizens to two campaign signs per

yard) (citing *G&V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1078 (6th

Cir. 1994)); *People for the Ethical Treatment of Animals v. Gittens*, 215 F. Supp. 120, 128

(D.D.C. 2002); *Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. District of Columbia,* 751 F. Supp. 218, 224 (D.D.C. 1990). In First Amendment cases, the likelihood of success on the merits is the most important factor, as other parties are not injured—and the public interest in a marketplace of ideas is served—by vindication of free speech interests. *See Gittens,* 215 F. Supp.2d at 128.

The neighbors have alleged that their speech has been threatened, and one of them fears erecting a sign because of government prosecution. (*See* Gustitus Aff. ¶ 24; McBride Aff. ¶ 12; Parenti Aff. ¶ 11; Ramoy Aff. ¶ 12; Todd Aff. ¶¶ 8-11, 13-14.). As such, preliminary relief is necessary. As discussed in more detail below, the regulations at issue violate bedrock principles of First Amendment law regarding the government's ability to regulate protected speech on private property, and the neighbors' frustrating and unsuccessful attempts to comply with the District's unconstitutional permit scheme illustrate the kinds of evils that the First Amendment seeks to prevent.[11] There is no doubt that the neighbors will succeed on the merits.

## II.    The District's Regulation of Political Speech on Private Property Violates the First Amendment.

### A.    *The Neighbors' Protected Speech on Private Property Enjoys a Special Level of First Amendment Freedom From Government Interference.*

The neighbors have engaged in the kind of political speech that receives the highest level of First Amendment protection. A statute regulating "speech of private citizens on

---

[11]    The First Amendment directly applies to the District of Columbia given the District's status as a federal entity. Moreover, the District of Columbia is amendable to suit for alleged violations of the First Amendment via the language of 42 U.S.C. § 1983. As this is a constitutional claim under that section, the neighbors are not required to exhaust administrative remedies, nor are they required to notify the District under D.C. Code § 12-309. *Monroe v. Pape,* 365 U.S. 167, 183 (1961); *Brown v. United States,* 742 F.2d 1498, 1510 (D.C. Cir. 1984) (holding D.C. Code § 12-309 inapplicable to 1983 claims); *Pica v. Sarno,* 907 F. Supp. 795, 800 (D.N.J. 1995) (administrative exhaustion not required in First Amendment cases).

14

private property or in a traditional public forum is presumptively impermissible, and this presumption is a very strong one." *Ladue,* 512 U.S. at 59 (O'Connor, J., concurring).    There are several reasons for the First Amendment's hostility to such regulations.    First, as a general matter, "a special respect for individual liberty in the home has long been part of our culture and our law …; that principle has special resonance when the government seeks to constrain a person's ability to *speak* there." *Ladue,* 512 U.S. at 58 (internal citations omitted) (emphasis in original).    The neighbors' chosen means of expressing themselves is a "venerable means of communication that is both unique and important." *Id.* at 54.

Second, "displaying a sign from one's own residence often carries a message quite distinct from placing the same sign someplace else, or conveying the same text or picture by other means." *See id.* at 56.    "Precisely because of their location, such signs identify the speaker, which is an important component of many attempts to persuade. *Id.* (internal quotation omitted).    Indeed, "a person who puts up a sign at her residence often intends to reach *neighbors,* an audience that could not be reached nearly as well by other means." *Id. at* 57 (emphasis in original).

Third, elimination of a "cheap and handy" method of communication implicitly contains a special tendency "to deter *individuals* from communicating their views to the public, for unlike businesses (and even political organizations) individuals generally realize few tangible benefits from such communication." *Id.* at 57 n.15.    As one court put it, "this form of speech affords the speaker considerable 'bang for the buck.'" *Knoeffler v. Town of Mamakating,* 87 F. Supp. 2d 322, 333 (S.D.N.Y. 2000).

Finally, "Signs that react to a local happening or express a view on a controversial issue both reflect and animate change in the life of a community." *Ladue,* 512 U.S. at 54.

Undue interference with yard signs may make the difference between "participating and not participating in some public debate" for some residents, directly undermining the First Amendment's competitive marketplace of ideas. *Id.* at 57; *cf. Cantwell v. Connecticut,* 310 U.S. 296, 310 ("[T]he people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these [First Amendment] liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy."). Whether the neighbors are "right" is, of course, entirely irrelevant for First Amendment purposes. The point of the signs is that, when all is said and done, a resolution of the neighborhood development issue made through vigorous (and occasionally contentious) public debate will be sounder than one made in its absence. *Cf. Cantwell,* 310 U.S. at 310.

The application of these principles ripples through every aspect of this dispute, and demonstrates why there are no adequate substitutes for yard signs in communicating the neighbors' message. The neighbors' decision to protest the zoning board's decision flows from their acutely local concern over the aesthetic quality of their neighborhood, and their belief that the zoning board's decision is incorrect. (*See* Gustitus Aff. ¶¶ 4-5; McBride Aff. ¶¶ 4-5, Parenti Aff. ¶¶ 4-5; Ramoy Aff. ¶¶ 4-5.) For example, the use of signs made out of plywood and spray paint is an inexpensive, effective and unique way of conveying the neighbor's viewpoint. (*See* McBride Aff. ¶ 2; Ramoy Aff. ¶ 2; Gustitus Aff. ¶ 2.) Further, the neighbors' concern over the aesthetics of their neighborhood has motivated the appearance of their signs in the first instance, and that is a message that they wish to convey to those in their immediate community. (*See* Ramoy Aff. ¶ 5l; McBride Aff. ¶ 4; Parenti Aff. ¶ 4; Gustitus Aff. ¶ 4.) Many community members have expressed agreement with their cause. (Gustitus Aff. ¶ 10; McBride Aff. ¶ 10; Ramoy Aff. ¶ 10). The signs also serve the

purpose of letting potential buyers know that their neighbors are opposed to their attempts to construct a house on the subdivided lot, a message that cannot be conveyed effectively from any other location. (*See* Ramoy Aff. ¶¶ 4-5; McBride Aff. ¶4-5; Parenti Aff. ¶ 4-5; Ramoy Aff. ¶¶ 4-5.) At least one neighbor has refrained from putting up her sign because of the threat of government prosecution, making the marketplace of ideas that much poorer.[12]  (Todd Aff. ¶¶ 7-11,13-14.)

The government interests at issue in time, place and manner regulation are at their nadir when regulating speech in residential areas. The District may only regulate this venerated form of protected speech through content neutral regulations that are tailored to legitimate state interests and effectively cabin official discretion. The District's Building Code does not come remotely close to meeting these constitutionally-mandated requirements.

**B.  *The City's Regulation of Protected Speech on Private Property in Sections 3107.3, 3107.6, 3107.6.3, 3107.7.7, and 3107.9 is Foreclosed by* City of Ladue v. Gilleo.**

Even assuming *arguendo* that the District's regulations are content-neutral, they violate the First Amendment.  That result is mandated by *City of Ladue v. Gilleo,* 512 U.S. 43 (1994), which invalidated a municipal ordinance functionally identical to the sign regulations in the Building Code, 12 D.C.M.R. § 107 *et seq. Ladue* instructs that, because of the special status of the home in civil liberties jurisprudence, the court should inquire *first* whether the government "may properly *prohibit*" signs on residential property, and then, "only if necessary" determine whether it was improper for the City to *allow* certain other signs. *Id.* at

---

[12]      *See also, e.g., Ladue,* 512 U.S. at 45 (involving sign reading "No to War in the Persian Gulf, Call Congress Now"); *Lusk v. Village of Cold Spring,* 2005 U.S. Dist. Lexis 18021 at *2, *5 (S.D.N.Y. Aug. 19, 2005) (finding sign on porch stating "Think that building is big" protected speech); *Knoeffler,* 87 F. Supp. 2d at 323, 327 (sign stating "Warning! Town Justice Allows Neighbors Biting Dog to Run Loose" considered protected speech); *Pica,* 907 F. Supp. at 800-01 ("Buyer beware" sign considered protected speech).

54 (emphasis in original).  The power of the District to *prohibit* residential signs does not exist.

There is no functional difference between a wholesale ban on signs and a permit requirement that bans all protest signs unless those signs are authorized first via a permit. *Ladue* controls this case, and makes clear that the power to ban those signs is lacking in the first instance.  *See* 512 U.S. at 58.  Nonetheless, that is precisely the power that the District regulations purport to exercise.  Section 102.1 of the Building Code (12 D.C.M.R. § 102.1) states that specific and more restrictive provisions control if two provisions govern the same conduct; the neighbors therefore begin their analysis with the most restrictive provision that applies to their protest signs. 12 D.C.M.R. § 3107.9.1.

### 1.    Section 3107.9.1 Denies the Neighbors Their Right to Speak in Direct Violation of *Ladue* and is Unconstitutional on Its Face.

Section 3107.9.1, which governs signage in residential districts, states that "No sign or signs shall be permitted in any Residential District… unless a permit is issued by the code official," *unless* the sign is "a nameplate not exceeding 1 square foot in area, to advertise a home occupation, *and* bearing only the name and occupation of the occupant of the building." *Id.* § 3107.9.5.1 (emphasis added).  The "Public Information" permit section, *id.* § 3107.9.5.1 (in addition to its other problems), is *permissive.  Compare id.* (stating that the code official "is authorized" to issue permits); *id.* § 3107.6.7 (same) *with id.* § 3107.8.1 (permits "shall" be issued for construction signs in *public* space).  The District's sign regulations assume— wrongly—that the government has the power to ban residential signs in the first instance.

Under *Ladue,* the District could not ban the neighbors' signs outright.  Yet, both Ms. Ramoy and Ms. Gustitus have attempted to receive permits, and have been told that their

18

signs are illegal and must be taken down. (*See* Ramoy Aff. ¶ 9; Gustitus Aff. ¶ 18). Indeed, there is no indication that the neighbors will *ever* get permits for their yard signs, rendering those signs illegal. (*See, e.g.,* Gustitus Aff. ¶ 18; Ramoy Aff. ¶ 9). The city's lack of a greater power to ban the signs completely forecloses their ability to condition the legality of the neighbors' signs on the presence of a permit, and renders section 3701.9.1 both unconstitutional on its face, and as applied to the neighbors' conduct. *See Ladue,* 512 U.S. at 56-59; *see also Pica,* 907 F. Supp. at 802 (describing variance procedure as no more than an unconstitutional prior restraint on free speech).

###### 2.  Sections 3107.3, 3107.6, 3107.6.3, and 3107.7.7 of the Building Code are Unconstitutional as Applied to Protected Speech on Residential Property.

The same reasoning that renders section 3107.9.1 unconstitutional also makes sections 3107.3, 3107.6, 3107.6.3, and 3107.7.7 invalid *as applied* to non-commercial speech in residential areas. *See* 12 D.C.M.R. §§ 3107.3, 3107.6, 3107.6.3, 3107.7.7. The plain language of these provisions does not exempt the neighbors' activity, and, like section 3107.9.1, bars signage unless a permit is granted or the content of the sign is exempted. *See id.* §§ 3107.3.1, 3107.6.1, 3107.6.7 (permissive permit requirement).[13]

Section 3107.6, entitled "Character of Advertising," states that "no signs of *any character*" shall be erected, except those that advertise a bona fide business, 12 D.C.M.R. § 3107.3, unless certain of the general exemptions in section 3107.3.5 apply, or unless a permit is issued. *See id* § 3107.6 (emphasis added); *see also id.* § 3107.3.5 (exemptions); 3107.6.7 (special permits). None of these exceptions apply to the neighbors' activity. Similarly,

---

[13]    The NOVs received by Ms. Ramoy, Mr. McBride, and Ms. Gustitus all cited to section 105.1.8 of the Building Code, which refers to 12 D.C.M.R. § 3107 as a whole. (*See* Gustitus Aff. Attach. 2; McBride Aff. Attach. 2; Ramoy Aff. Attach. 2.)

19

section 3107.7.7 forbids the code official from even *issuing* a permit for the hanging of a

protest sign on the wall of a building if "no sign or signs [already] exists on the side wall of

any building or structure."[14]    Finally, section 3107.6.3 states that no "signs or posters of a

*miscellaneous* character, visible from the street or public way" may be displayed except as

provided in that section. *Id.* § 3107.6.3 (emphasis added).

        *Ladue* makes clear that these three sections cannot be constitutionally applied to

residential property, as they each purport to ban all signs unless a permit is issued (and one

may never be).[15]  *See* 12 D.C.M.R. § 105.3.1 (failing to impose a time limit on the issuance of

permits).  In addition to impermissibly banning all signs, *see Ladue*, 512 U.S. at 58, section

3701.6.3 contains the additional problem of unconstitutional vagueness, as the poster of a

sign would have no idea whether their sign's nature is "miscellaneous," and a government

official would have unlimited discretion to make content-related judgments whether to

enforce the Building Code's penalty provisions. *See, e.g., Lakewood*, 486 U.S. at 756-57.  In

any event, *Ladue* forecloses the application of these provisions to the neighbors, who are

seeking to protest government action on their own private property. *See* 512 U.S. at 58.

### a) Section 3107.3 Burdens too Much Speech

        Unlike the above sections, which by their terms purport to ban *all* signs without a

permit, section 3107.3 states that all signs greater than one square foot in area require a permit

unless exempted, and no applicable exemption exists for the kind of noncommercial speech in

which the neighbors have engaged. *See* 12 D.C.M.R. § 3107.3, 3107.3.5 (exemptions).  The

---

[14]    The section contains two exceptions from the requirement that would not apply in this case nor to most
single family homes. *See* 12 D.C.M.R. §§ 3107.7.7.1 (permitting signs on corner buildings if they abut a public
street or that have business entrances in alleys); 3107.7.7.2 (walls facing parking lots).

[15]    The District's regulations even purport to regulate speech that occurs *inside* the home. *See* 12
D.C.M.R. § 3107.3.5.3 (exempting only those signs that are more than 18 inches away from a window) from the
general requirement in section 3107.3).

government has no colorable interest in restricting yard signs to such a size. Indeed, the applicable government interests in traffic safety that apply in signage cases are virtually eliminated when the government seeks to regulate protest signs on private property, as "individual residents themselves have strong incentives to keep their own property values up and to prevent visual clutter in their own yards and neighborhoods—incentives markedly different from those of persons who erect sign on others' land, in others' neighborhoods, or on public property." *Ladue,* 512 U.S. at 58-59. People who put up yard signs have a right to have their messages understood and read by pedestrians and passing traffic. One square foot is not sufficiently large to attract attention from passing cars or pedestrians, particularly when the permit number and date of issuance must be displayed in inch-high lettering. *See* 12 D.C.M.R. § 3107.5.

Moreover, the incoherent scheme of exemptions to section 3107.3's permit requirements in section 3107.3.5 (and elsewhere) destroys any credible government interest in preventing the safety risks associated with visual clutter and limiting residential signs to such a size. *See Ladue,* 512 U.S. at 52, 58-59 (discussing effect of exceptions and reduced government interest in visual clutter); *see also id.* at 49; *Pica,* 907 F. Supp. at 800; *Knoeffler,* 87 F. Supp. 2d at 327.[16] For example, a 12" x 13"cardboard sign stating "VOTE FOR BUSH" placed in a yard or near a living room window, *even if it is displayed more than a foot away from that window inside the home,* must be cleared by the code official before it can be

---

[16] Unlike the ordinance in *Ladue,* however, which contained findings regarding the municipality's interests in traffic safety and controlling visual clutter, the Building Code and its enabling legislation make *no* express reference to traffic safety or aesthetics. *Compare Ladue,* 512 U.S. at 47 (quoting express findings regarding aesthetics and safety and traffic hazards), *with* D.C. Code § 6-1404 (referring only generally to interests in "public safety, health, and welfare by building construction" and "in general, to secure safety to life and property from all hazards incident to the design, erection, repair, removal, demolition, or use and occupancy of buildings, structures, or premises."); 12 D.C.M.R. § 101.2.4 (similar). Even making the stretched assumption that the interests in preventing visual clutter and controlling traffic motivated the regulations, the Building Code does not permissibly advance them.

lawfully displayed. *See id.* §§ 3107.3; 3107.3.5.3; 3107.9.1. Protesters who walk through public space, or union picketers (such as those in recent immigration or Falun Gong protests) routinely carry signs well beyond that size through the streets of the city.[17]

　　In contrast, real estate signs up to six square feet in area need no permit or government review whatsoever, no matter how the property in which they appear might be zoned, who wishes to display them, or how they are displayed. *See id.* § 3107.3.5.7; *see also* D.C. Code § 42-1801 (granting permission to post temporary real estate signs on public property with no express size limitation). Indeed, in terms of traffic hazards, temporary directional signs to open houses pose significant risks, as drivers looking for addresses in unfamiliar residential neighborhoods may well pay more attention to street names than pedestrians. Such signs, however, do not require permits at all—irrespective of size—even though they appear on public property. *See* D.C. Code § 42-1801; 12 D.C.M.R. §§ 3107.6.6, 3107.16.4; *cf. Linmark Assoc. v. Township of Willingboro,* 431 U.S. 85, 94-95 (1977) (invalidating ban on real estate advertising on private property, even when ban designed to advance substantial interest of racial integration). [18] Similarly, *any* sign advertising "nonconforming uses" under the zoning regulations[19] may be up to *40* square feet in area, and does not require the property owner to

---

[17]　　*See, e.g.,* Wash. Post, April 11, 2006, at A1 (displaying photograph of protestor carrying sign well over one square foot).

[18]　　Variations in the code official's discretion also show the lack of tailoring in the Building Code. For example, unlike permits for "public information," which are discretionary, see 3107.9.5.1, "a permit *shall* be issued to erect, hang … or display *any* sign advertising the sale, rent or lease of real estate, or which in *any manner pertains to* land or buildings." *See* 12 D.C.M.R. § 3107.16.4 (emphasis added). Similarly, temporary sign permits in residential zones must be issued for signs up to 40 feet in size, even when located in a public place. *See id.* § 3107.8. The neighbors' complaint, however, goes to the ability to regulate signs in the first instance under *Ladue*, not on the specific application of any particular provision.

[19]　　The zoning regulations define a nonconforming use as:

　　　　any use of land or of a structure, or of a structure and land in combination, lawfully in
　　　　existence at the time this title or any amendment to this title became effective, that does not
　　　　conform to the use provisions for the district in which the use is located.  A use lawfully in
　　　　existence at the time of adoption or amendment of this title that would thereafter require

produce a plat or a code official to approve the permit after examining the sign and its location on the property. *See* 12 D.C.M.R. §§ 3107.9.1.[20] These numerous exemptions, as well as the presence of advertising on buses (*see* Ex. F) eviscerate any claims to traffic safety that the government might claim.[21]

### C. *The Permit Requirement Itself Places an Impermissible Burden on the Exercise of First Amendment Rights.*

The District's permit application process that must take place *before* a residential sign can lawfully be displayed under any of the challenged sections has an additional constitutional defect in that the burden of compliance impermissibly will prevent many people from speaking at all:

> It is offensive—not only to the values protected by the First Amendment, but to the very notion of a free society—that in the course of ordinary public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so. Even if the issuance of permits by the mayor's office is a ministerial task that is performed promptly and at no cost to the applicant, a law requiring a permit to engage in such speech constitutes a dramatic departure from our constitutional tradition.

---

special exception approval from the Board of Zoning Adjustment shall not be deemed a nonconforming use. That nonconforming use shall be considered a conforming use, subject to the further provisions of §§ 3104.2 and 3104.3.

11 D.C.M.R. 199.1 (internal citation omitted).

[20]    *See also, e.g., id.* § 3107.9.5.4 (Church bulletins may be as large as 20 square feet and do not require permits before they may be posted); *id.* § 3107.3.5.8 (stating that vacant buildings may display signs); *id.* §§ 3107.3.5.1, 3107.3.5.2 (exempting the changing of matter on billboards or theater bills on "established frames" does not undergo government review before being displayed); *id.* § 3701.3.5.5 (stating that businesses located in commercial zones may display 3 signs of four square feet each without prior government approval).

[21]    The Building Code's provisions arguably leave open even less alternative avenues of communication than the ordinance in *Ladue.* There, counsel for the city observed that the city's sign ordinance did not inhibit the use of flags or banners as an alternative means of communication. *Ladue,* 512 U.S. at 58 n.16. Here, in contrast, the Building Code prevents any "banner, sign or flag used for advertising purposes" from being hung without a permit. 12 D.C.M.R. § 3107.5. The regulation is silent on whether or not the term "advertising" includes matters of public or neighborhood concern. Even if the regulation is read to apply only to commercial speech, "the mere possibility that another medium could be used in an unconventional manner to carry the same messages" does not alter the fact that the Building Code has banned a "distinct and traditionally important medium of expression." *Ladue,* 512 U.S. at 58 n.16.

*Watchtower Bible and Tract Soc'y of New York v. Village of Stratton,* 536 U.S. 150, 165-66 (2002).

In *Watchtower Bible*, the Supreme Court found that a township could not require canvassers to obtain permits before going door-to-door and leafleting on public property, an area where the government's interests in preventing crime or littering are far greater than on private property. *See, e.g., id.* at 169 (dismissing crime concern); *Lovell v. Griffin,* 303 U.S. 444, 451-52 (1938) (invalidating leafleting ordinance); *cf. Ladue,* 512 U.S. at 58 (noting diminished interest of government in regulating speech on private property). *Any* blanket permit requirement for residential protest signs—much less one that carries the possibility of fines, denial of permits for future, unrelated construction, and incarceration—will improperly result in a "significant amount of spontaneous speech that is effectively banned," *Watchtower Bible,* 536 U.S. at 167, and, for these neighbors, "may well make the difference between participating and not participating in some public debate." *Ladue,* 512 U.S. at 57. The government may not regulate speech in this fashion. *See Lovell v. Griffin,* 303 U.S. 444, 451 (1938) ("Whatever the motive which induced its adoption, its character is such that it strikes at the very foundation of the freedom of the press by subjecting it to license and censorship. … [T]he liberty of the press became initially a right to publish without a license what formerly could be published only with one.") (internal quotation and citation omitted); *Kunz v. New York,* 340 U.S. 290, 293-94 (1951) *Saia v. New York,* 334 U.S. 558, 560-61 (1948) (applying *Cantwell* and *Lovell*). If the government cannot burden speech via licensing in a *public* forum where its interests in crime prevention, visual clutter and aesthetics are far higher, it follows that it cannot impose such requirements on residential yard signs, when its interests are at their lowest point. *Compare, e.g., Ladue,* 512 U.S. at 58 (discussing reduced

government interest in private signage regulation); *with Watchtower Bible,* 536 U.S. at 168-69 (striking down permit requirement despite state interest in prevention of crime and resident privacy); *Lovell,* 303 U.S. at 451 (striking down licensing requirement despite city's interest in preventing litter). *Cf. Linmark,* 431 U.S. at 94-95 (racial integration not sufficient interest to ban commercial speech on private property).

      The burden of compliance with the Building Code's Byzantine provisions— particularly for working people who can all too often ill afford to devote the time and resources needed to do so — is neither "ministerial," "performed promptly," nor free of cost. *Watchtower Bible,* 536 U.S. at 166. For example, the Building Code requires that a person wishing to place a protest sign in their front yard must provide drawings in triplicate, "drawn to scale showing details of construction dimensions, lettering, and method of attachment of the sign." *Id.* § 3107.3.1. In addition, the application must state the width of premises or width and height of the building, or any other dimensions deemed necessary by the code official to determine the allowable area of the sign. *Id.* § 3107.3.2. The cost of obtaining a required plat of the property is $30, and the neighbors waited approximately four business days. (*See* Gustitus Aff. ¶ 12; Parenti Aff. ¶ 7.)

      The neighbors' experience demonstrates the extraordinary burdens that permit requirements place on individual speech. *Cf. Ladue,* 512 U.S. at 57 n.16. The effect of the District's requirements on Ms. Todd's First Amendment rights is obvious. Agreeing with the views of her neighbors, Ms. Todd nonetheless refrained from speaking upon hearing about her neighbors' receipt of the NOVs and their burdens in negotiating the city bureaucracy. (Todd Aff. ¶¶ 4-9, 13-14.) If these regulations are upheld, Ms. Parenti, Ms. Gustitus, and Ms. Ramoy, who have collectively spent several frustrating and futile hours trying to get a permit,

will simply be compelled to abstain from making their views known, despite their strong feelings on the zoning issue.  (Gustitus Aff. ¶¶ 7-21, 23-24; McBride Aff. ¶¶ 7-12; Ramoy Aff. ¶¶ 7-9, 11-12; Parenti Aff. ¶¶ 7-11.)  The principles enunciated in *Ladue, Lovell* and *Watchtower Bible* firmly prohibit the government from requiring the neighbors to obtain its permission before protesting on their own property.

### D.  *The Permit Requirements in Sections 3107.6 and 3107.9.7 Are Standardless.*

In addition to failing *Ladue*'s tests, the Building Code's permit requirements have another fatal, but entirely different constitutional problem: they fail to properly confine the government's discretion regarding protected First Amendment activity.  "When a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially."  *Lakewood,* 486 U.S. at 755.[22]  Like the newspaper ordinance struck down in *Lakewood,* this provision of the Building Code is "directed narrowly and specifically at expression or conduct commonly associated with expression."  *Id.* at 760.

As discussed above, the Building Code does not exempt the neighbors' yard signs from the permit requirement, and therefore prohibits them unless a permit is issued.  The permit requirements themselves, however, are facially unconstitutional.

### 1.  Section 3107.9.5.1 Requires Government Officials to Make Standardless, Content-Based Judgments.

---

[22]    *See also Thornhill,* 310 U.S. at 97 (1940) ("One who might have had a license for the asking may . . . call into question the whole scheme of licensing when he is prosecuted for failure to procure it.").

The ban on signage in residential areas under section 3107.9.1 contains a permit requirement antithetical to First Amendment values.  That section states:

> **Public information.** The code official is authorized to issue temporary permits for signs to advertise matters of a **public, semi-public, or charitable character**. Such temporary permits shall be granted for a period not to exceed thirty (30) days.

12 D.C.M.R. § 3107.9.5.1 (emphasis added).

This provision contains two fatal and unmistakable First Amendment defects.  First, in order to decide whether to issue a permit for a sign in a residential zone, the official must review the sign's message and make content-based distinctions between "charitable," "semi-public" or "public" character, without the benefit of any objective criteria.[23]  Each of these concepts is inherently (and impermissibly) self-defining, and the presence of such discretion has and will lead directly to arbitrary, impermissible, content-based judgments.  In this case, for example, Ms. Gustitus pointed out the "public information" permit exception to the residential code to an employee at DCRA.  (Gustitus Aff. ¶ 18.)  That employee stated that the section did not apply, and sent her on her way.  (*See id.*)  Decades of First Amendment jurisprudence flatly prohibit government officials from making these kinds of subjective distinctions.[24]  *See, e.g., Cox v. Louisiana*, 379 U.S. 536, 557 (1965) (noting that a long line of Supreme Court cases "makes it clear that a State or municipality cannot require all who wish to disseminate ideas to present them first to police authorities for their consideration and

---

[23]    "Private" signs are ostensibly prohibited, and even the word "charitable" itself is ambiguous.  It might be a synonym for eleemosynary, or it might be a intended to mean "Mild or tolerant in judging others; lenient." American Heritage Dictionary, *at* http://www.dictionary.com (visited April 12, 2006).  The official could theoretically deny a permit application because it did not meet his own definition of kindness—particularly if it discussed him.

[24]    By way of comparison, the billboard permit requirements, *see* 12 D.C.M.R. § 3107.6.7, address no content-related issues whatsoever.  The neighbors suspect that the interests of advertisers, billboard owners and developers were well represented within the Building Code's private author.

approval, with a discretion in the police to say some ideas may, while others may not, be . . . disseminate[d] . . . .") (internal citation and quotation omitted).

Second, when combined with its vague language, the monthly renewal provisions of these permits raise a separate First Amendment problem—that proving the link between "licensed" speech and the denial of a later license may be impossible." *Lakewood*, 486 U.S. at 759-60. In *Lakewood*, the Supreme Court invalidated a standardless ordinance in part because it required the newspaper publisher to re-apply for permits annually and granted mayoral authority to impose "necessary and reasonable" conditions. *See id.* at 754, 759. The Court found that the renewal provisions create additional First Amendment concerns because "when such a system is applied to speech, the licensor does not necessarily view the text of the words about to be spoken, but can measure their probable content or viewpoint by speech already uttered." *Id.* at 759. Under these provisions, for example, the Mayor might elect to authorize "public information" permits critical of his education or development policies just after an electoral victory, but then cut them off in plenty of time for the next campaign as they merely reflect "private" opinions.

### 2.  Section 3107.6.7 Suffers from the Same Fatal Defects.

The neighbors also challenge the permit requirement in section 3107.6 which seems to authorize the code official to issue a permit for a sign not conforming with the requirements of section 3107.  That provision states:

> **Special Permits.**  The code official is authorized to issue a permit to erect and maintain a sign not conforming with this Section[25] if the code official finds that such sign or conditions surrounding such sign are **unusual in character, of a**

---

[25]     It is unclear whether the word "Section" refers to section 3107 as a whole, or just 3107.6, as it is used both ways. *See* 12 D.C.M.R. § 3701.3 ("Section"); 12 D.C.M.R. § 3107.3 (applying "Section" to real estate signs); 3107.9.1 ("Section").  That ambiguity, however, makes no difference to the resolution of this case.

**type infrequently encountered, and that approval of the permit will aid in the promotion of an activity of an exclusively civic nature** or will provide an equitable application of this Section **basically in keeping** with its purpose and intent. The code official in each such special permit is authorized to impose such terms and conditions **as he or she may deem necessary**.

12 D.C.M.R. 3107.6.7 (emphasis added).

The number of impermissible content-based judgments required by this provision is breathtaking. The code official *may* issue a permit if the sign is "unusual," "infrequent" and "exclusively civic," or "basically in keeping" with the purpose and intent of the code. *Id.* By making a permit dependent on whether the sign is of a type "infrequently encountered," or "unusual in nature" for example, the speaker's rights depend entirely on the code official's subjective judgments. The code official may also add whatever conditions to the permit he wishes and has no time period in which he must grant or deny the permit, in direct violation of *Lakewood* and other long-standing cases. *See* 486 U.S. at 759; *see also, e.g., Cox,* 379 U.S. at 553-54; *Freedman v. Maryland,* 380 U.S. 51, 59-60 (1965) (requiring submission is a prior restraint).

**E.    *The City's Regulations Discriminate on the Basis of Content.***

In addition to their problems under *Ladue, Watchtower,* and *Lakewood,* sections 3107.1, 3107.6, 3107.6.3, 3107.7.7, and 3107.9.1 also fail under a traditional content-based analysis because they completely ban all noncommercial speech occurring in residential zones, while permitting a variety of commercial advertising to take place in those same areas. *See, e.g.,* 12 D.C.M.R. §§ 3701.1, 3701.9.1. Put simply, a realtor, or a *church* bulletin (3107.9.5.4) does not need a permit, but an Iraq war protester (and perhaps a synagogue) does. "The fact that these content-based provisions take the form not of regulations but of

29

exemptions from regulations is immaterial." *Solantic, LLC v. City of Neptune Beach*, 410 F.3d

1250, 1264 n.13 (11th Cir. 2005); *see also id.* at 1257 n.6. As the Eleventh Circuit has

explained, "when a city's goal is to reward one type of speech, the necessary effect is that all

other types of speech are penalized. A finding that the motive was to promote, rather than to

penalize, a certain type of speech does not alter this fact." *Id.* (internal quotation and citation

omitted). *See also, e.g., Whitton v. City of Gladstone*, 54 F.3d 1400, 1403-04 (8th Cir. 1995)

(citing *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1992)); *Ackerley*

*Communications of Mass., Inc. v. City of Somerville*, 878 F.2d 513, 521 (1st Cir. 1989).

"Whether these content-based restrictions are cast as regulations or exemptions is simply a

matter of semantics," *Solantic*, 410 F.3d at 1264 n.13. The kind of regulations contained in

the Building Code constitutes content discrimination, and is unconstitutional.[26]

### F. To Avoid Further Confusion, 24 D.C.M.R. § 108 Should Be Unambiguously Declared to Apply Only To Public Places, Not Residential Ones.

Out of an abundance of caution, the neighbors respectfully ask that this court to issue a

declaration that section 108 applies only in the context of public property and has no

application to the type of residential-based activity at issue here. *See* 24 D.C.M.R. § 108.

The DCRA's public statement that the District's municipal regulations allow for campaign

signs (and only campaign signs) on private property (see Ex. F) is incorrect. Given this

public misstatement that Section 108 does apply to residential signs, as well as what seems to

be considerable confusion within the District government regarding the applicability of the

Building Code (see Parenti Aff. ¶ 7), neighbors fear that the District will claim—

incorrectly—that Section 108 applies to residential settings.

---

[26]     *Accord McFadden*, 2006 U.S. Dist. Lexis 13348 at *2; *Lusk*, 2005 U.S. Dist. Lexis 18021, at 20-21;
*Fierbach,* 341 F. Supp. 2d at 732; *Savago v. Village of New Paltz*, 214 F. Supp. 2d 252, 258 (N.D.N.Y. 2002)
(striking down ordinance based on permit requirement on some signs but not others); *Sugarman v. Village of
Chester*, 192 F. Supp. 2d 282, 289 (S.D.N.Y. 2002); *Knoeffler,* 87 F. Supp. 2d at 327.

Critically, as written, the District's regulations permitting the display of campaign sign in certain circumstances do not apply to displays on private property. Chapter one of title 24, entitled "Occupation and Use of *Public* Space" (emphasis added) governs the placement of political campaign signs on *public* property—specifically lampposts. *See* 24 D.C.M.R. § 108. 5(a), (b); *see also id.* § 100 (describing mayor's authority over the use of public space) Section 108.1 states that no advertisements or signs may be affixed to public lampposts except in accordance with the section. *Id.* § 108.1. These are the relevant provisions in the District, and despite DCRA's comments to the contrary, there are no other provisions on the books that allow for the display of campaign signs on residential property. [27]

### G. Numerous Less Burdensome Means Exist to Advance the Government's Interest in Safety.

The neighbors wish to stress that it is *not* their position that *Ladue* or any other of the cases cited herein completely bar the District from regulating residential signage. (They do, after all, have to live here). A more temperate means of regulation would involve leaving residential, non-commercial signs unregulated under a certain large size, and then adding a content-neutral, quickly administered and objective permit requirement that provides ready

---

[27]     If construed beyond "public lampposts," see 24 D.C.M.R. 108.1, section 108's application to the neighbors' yard signs would be constitutionally barred. The neighbors note that if "a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided," the court's "duty is to adopt the latter." *See Harris v. United States,* 536 U.S. 545, 555 (2002). First, the categorical ban in this provision cannot be constitutionally applied to the neighbors' yard signs under *Ladue. See* 512 U.S. at 53 (noting that inquiring into permissible exemptions from a categorical sign ban is of no use to a speaker if her speech is not exempted); *see also, e.g., Arlington County Republican Party v. Arlington County,* 983 F.2d 587, 595 (4th Cir. 1993) (striking down sign limitations on private property); *Fehrbach v. City of Troy,* 341 F. Supp. 2d 727, 731 (E.D. Mich. 2004) (striking down 2-campaign sign limit). Second by its terms, section 108.5 favors campaign signs (of any size) and "crime prevention" signs (of any size), and bans protest signs completely--immediately raising the specter of content discrimination. *See McFadden v. City of Bridgeport,* 2006 U.S. Dist. Lexis 13348, at *2 (N.D. W. Va. Mar. 20, 2006). The regulations are plainly unconstitutional; however, this Court need not necessarily resolve these issues to grant the neighbors the relief they are seeking because these campaign sign regulations simply do not apply to the residential signs at issue here. Ms. Argo's statement and the neighbors' experience suggests that the District may, however, be selectively enforcing its sign regulations under section 3107 based on the content of the message in those signs. (See also Todd Aff. ¶¶ 6-10).

access to judicial review.[28]  Given the public criticism of the District's signage laws, the

neighbors suggest that many, if not all, of the constitutional problems that currently exist in

the residential sign code will disappear once these measures are considered through a normal,

transparent legislative process. (*Cf.* Ex F (harshly criticizing the District government's

conduct with respect to the neighbors).)  Instead, the District's elected officials permitted its

residents' First Amendment rights to be subject to laws drafted by a private entity whose

members have no interest in the First Amendment and slipped into law within hundreds of

pages of unrelated regulations.  Had the sign provisions been the subject of a full legislative

process, the neighbors suspect that (at the very least) the sign regulations would have looked

very different, as each council member would have been on record with respect to legislation

requiring District residents to obtain permits to exercise their free speech rights.[29]  Be that as

it may, the District's existing scheme of signage regulation is unconstitutional and should be

enjoined.

## CONCLUSION

For all of the foregoing reasons, the neighbors' motion for a preliminary injunction

should be GRANTED.

---

[28]     Even in the unregulated area, the government's interests in safety are served by a number of content-neutral common law and statutory provisions.  For example, a property owner has a duty to prevent reasonably foreseeable harm to others from any artificial condition he creates on his land, and is liable in tort for a failure to do so. *See Restatement (2d) of Torts* § 364 (Creation or Maintenance of Dangerous Artificial Conditions).

[29]     Indeed, a question exists over whether the legislative procedure by which these rules were promulgated are valid at all. *See Wilson v. Kelley,* 615 A.2d 229, 230 (D.C. Ct. App. 1992). The D.C. Code requires that the Council use Acts for all legislative purposes, save two. *Id.* § 1-204.04(a). First, resolutions "shall" be used to express "simple determinations, decisions, or directions of a special or temporary character." D.C. Code. § 1-204.12(a)(1). Whatever the he 200-plus pages of the Building Code (much less its 30 pages of sign regulations) may be, they are neither simple, special, nor temporary. *See, e.g., Wilson,* 615 A.2d at 230. Second, the Council shall use resolutions to "approve or disapprove proposed actions of a kind historically or traditionally transmitted by the Mayor." *Id.* § 1-204.12(a)(2). If the amendments to these regulations are valid, they lie at the very outer edge of the Council's resolution authority. *Cf. Wilson, supra.*

Respectfully submitted,

On: _5/2/06_____

By: _Christopher A Mohr_____
Christopher A. Mohr
D.C. Bar No.  458599
Michael R. Klipper
D.C. Bar No.  166074

Meyer, Klipper & Mohr PLLC
923 Fifteenth Street, NW
Washington, D.C. 20005
Voice: 202-637-0850
Fax: 202-637-0851