**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
LINDA GUSTITUS, ET AL.,                 )
                                        )
           Plaintiffs,                  )
                                        )
    v.                                  )  Case No.  1:06-cv-00814-EGS
                                        )
ANTHONY WILLIAMS, ET AL.,               )
                                        )
           Defendants.                  )
_____)


**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES
IN RESPONSE TO THE EMERGENCY RULEMAKING
BY THE DISTRICT OF COLUMBIA AND IN SUPPORT OF PLAINTIFFS' MOTION
FOR A PRELIMINARY INJUNCTION**


**INTRODUCTION**

Since the filing of this case, on May 30, 2006, the District purported to adopt an

emergency rulemaking under D.C. Code § 2-505, signed by the Director of the Department of

Consumer and Regulatory Affairs (DCRA) under the authority of the Mayor.  That rulemaking

revises Section 3107A (Signs) of Title 12A of the District of Columbia Municipal Regulations

(the "Building Code").  The sole basis given for the emergency rulemaking is that "[t]he current

building code regulations are ambiguous and could create uncertainty concerning the legal

requirements for posting [certain kinds of] signs."   That rulemaking was presented to counsel for

the plaintiffs ("the neighbors") on June 1, and discussed at a status hearing on June 2.  The

neighbors have now had an opportunity to review the rulemaking.[1]

The section on which the District relies for the power to promulgate its emergency

rulemaking, according to an email courteously sent to the neighbors' counsel on June 2, 2006, is

section 2-505(c) of the D.C. Code.[2]   For the reasons set forth below, that rulemaking is both

procedurally and constitutionally invalid, and represents an unlawful usurpation by the Mayor of

the Council's legislative authority.   Consequently, the emergency rulemaking is ineffective and

the question reverts back to the one raised in the neighbors' initial Memorandum of Points and

Authorities in Support of Their Motion for a Preliminary Injunction (hereinafter "Memo in

Support"):  whether the challenged provisions of the Building Code and the other portions of the

District's municipal regulations are unconstitutional.  For that reason, the neighbors discuss the

---

[1]     At the June 2 status hearing, the neighbors' counsel's notes reflect that the District stated that the emergency rulemaking would be published in the D.C. Register on June 9.  As of the filing of this brief, the emergency rulemaking has not appeared in the D.C. Register.  The failure of the public to have notice of this rulemaking is of direct relevance to this litigation in that it forecloses any mootness argument by the District based on the emergency rule.  Despite language in the D.C. Code stating that emergency rulemakings take effect immediately without publication, *see* D.C. Code § 2-558(b), it would offend the most basic notions of due process to create financial and criminal liability under a provision that no one except the Court (and, ironically, the neighbors) has ever seen.  Certainly no citizen could be fined, prosecuted or enjoined under D.C. Code § 6-1406 based on a regulation of which she had no notice, solely on the Mayor's executive authority.  Thus, for every citizen in the District (other than the neighbors, perhaps), the pre-existing (and equally unconstitutional) regulations remain legally in effect and the District is foreclosed from arguing mootness on this ground until such time as that notice appears in the D.C. Register.  The neighbors assume for the purposes of argument that this rulemaking will be published shortly.

[2]     The provision reads as follows:

Notwithstanding any other provision of this section, if, in an emergency, as determined by the Mayor or an independent agency, the adoption of a rule is necessary for the immediate preservation of the public peace, health, safety, welfare, or morals, the Mayor or such independent agency may adopt such rules as may be necessary in the circumstances, and such rule may become effective immediately.  Any such emergency rule shall forthwith be published and filed in the manner prescribed in subchapter III of this chapter.  No such rule shall remain in effect longer than 120 days after the date of its adoption.

D.C. Code § 2-505 (c).

The provisions of § 2-505 were enacted in 1968 as part of D.C.'s Administrative Procedure Act, and they apply generally to the rulemakings by all of D.C.'s executive agencies.  *See* D.C. Code § 2-505; 82 Stat. 1206 (1968).

procedural issue first, and will then assume for the purposes of argument that the rulemaking is

valid and will discuss why the amended regulations are unconstitutional.

### Statutory Framework of the Building Code

The municipal regulations at issue in this case (12 D.C.M.R. § 101 *et seq.*) were not

actually written by the District of Columbia's elected representatives.  Rather than draft its own

building code, the District of Columbia has outsourced the writing of its building code—

including its sign regulations—to a private organization whose members have no interest in the

First Amendment rights of the citizenry, and has given the Mayor authority to enforce them.

D.C. Code §§ 6-1401(4), (12) (defining, respectively, "construction" and "model" codes); 6-

1402 (adopting code); 6-1405.01 (a), (d) (granting authority to enforce to the Mayor or his

designee, and delegating the administration of those codes to the director of the District's

Department of Consumer and Regulatory Affairs).[3]  When the International Code Council (ICC)

makes changes to those codes, they become law by default.  The Mayor *must* propose the

amendments to the City Council, D.C. Code § 6-1409, and then the Council has a 45-day review

period excluding weekends, holidays, and periods of recess.  If the Council does not approve,

disapprove, or amend the new provisions, the ICC's changes are deemed approved by the

---

[3]      The District's building code was drafted by the International Code Counsel (ICC).  *See* 51 D.C. Reg. 292
(Jan. 9, 2004) (enacting 2003 Building Code); 50 D.C. Reg. 6454 (Aug. 8, 2003) (proposing 2003 Building Code).
The ICC was founded by Building Officials and Code Administrators International, Inc. (BOCA), International
Conference of Building Officials (ICBO), and Southern Building Code Congress International, Inc. (SBCCI).  *About
ICC, at* http://www.iccsafe.org/news/about/.  The ICC's predecessor organization, SBCCI, has been described as
consisting of members of the construction and real estate development industries.  *See Int'l Code Council, Inc. v.
Nat'l Fire Prot. Ass'n*, 2006 U.S. Dist. LEXIS 13783, at *2-6 (N.D. Ill. Mar. 27, 2006); *Veeck v. S. Bldg. Code
Cong. Int'l*, 293 F.3d 791, 793 (5th Cir. 2002).  According to the ICC's web site, some version of the ICC's 2003
code has been adopted as law in over 1500 other jurisdictions.  *See* www.iccsafe.org/government/adoptions (link to
spreadsheet of adoptions is on right side of cited page) (visited May 10, 2006).

Council and acquire the force of law. *Id.* The Building Code provisions at issue in this case initially became law on January 9, 2004. 51 D.C. Reg. 292 (Jan. 9, 2004).[4]

The District of Columbia Building Code Supplement of 2003, codified at 12 D.C.M.R. § 101 *et seq.* ("Building Code"), governs the "construction, reconstruction, alteration, addition, repair, removal, demolition, use, location, occupancy, and maintenance of all buildings, structures, signs, advertising devices, and premises in the District." D.C. Code § 6-1403(a)(1).[5] The stated intent of the Code is to

> ensure public safety, health and welfare by building construction, through structured strength, energy and water conservation, accessibility to the physically handicapped, adequate egress facilities, sanitary equipment, light, ventilation and fire safety; and, in general, the secure safety to life and property from all hazards incident to the design, erection and repair, removal, demolition, or use and occupancy of buildings, structures, or premises.

*Id.* § 6-1404. Neither the Building Code nor its enabling statute mentions aesthetics or traffic control in their statements of intent.

The neighbors face significant penalties for violation of the sign provisions. *Any* violation of the Building Code may be enforced either civilly pursuant to the administrative enforcement provisions of the D.C. Code, see *id.* § 6-1406(c), or criminally, via fines of up to $2000 and ten days imprisonment, *id.* § 6-1406(a). In addition, the Mayor may, at his discretion, deny a building permit (for unrelated projects) to a convicted Building Code violator for a period of three years after the finding of a violation. D.C. Code § 6-1407.01(3). Finally, the regulations also unequivocally instruct reviewing courts and officials that they are to be construed severely. "When different sections of this code specify different requirements for the same specific case,

---

[4]    The regulations are available online at
http://dcra.dc.gov/dcra/frames.asp?doc=/dcra/lib/dcra/information/forms_docs/pdf/dcmr12.pdf&open=|33466|.

[5]    The regulations do not define the term "sign," but the D.C. Code defines it as "a name, identification, description, display, or illustration which is affixed to, or represented directly or indirectly upon a building, structure, or piece of land and which directs attention to an object, product, place, activity, person, institution, organization, or business." D.C. Code § 22-3312.05(10).

the most restrictive shall govern.  When there is a conflict between a general requirement and a specific requirement, the specific requirement shall be applicable."  12 D.C.M.R. § 102.1.


## ARGUMENT

# I.  The Emergency Rulemaking Is Procedurally Invalid

### A.  *The Plain Language of Section 6-1409 Renders the Emergency Rulemaking Invalid*

The District's emergency rulemaking is contrary to law.  The D.C. Code is very explicit about the circumstances under which the Mayor may use the emergency rulemaking provisions in D.C. § Code 2-505 to amend the Building Code without Council review.  *See* D.C. Code § 6-1409(a), (a-1).  The **only** time that the Building Code's amendment statute permits an emergency rulemaking to take place and be given effect *without* Council review is with respect to changes to section 12 D.C.M.R. § 3107.18, which relates to the development of Gallery Place.  *See id.* § 6-1409(a-1) ("Gallery Place Exception").  Amendments to any other provision of the Building Code (12 D.C.M.R. § 3701) cannot be given legal effect solely via emergency rulemaking under D.C. Code § 2-505—the Council has explicitly forbidden such action.  The relevant provisions of section 6-1409, which govern the amendments to the Building Code, make this point abundantly clear:

6-1409 Amendments; supplements; editions.

(a) All future amendments, supplements, and editions of the Construction Codes shall be adopted only upon authority of the government of the District of Columbia.  **The Mayor may issue proposed rules to amend the Construction Codes and to adopt new supplements and editions of the Model Codes in whole or in part pursuant to subchapter I of Chapter 5 of Title 2.  The proposed rules *shall be submitted to the Council for a 45-day period of review*,**

> **excluding Saturdays, Sundays, legal holidays, and days of Council recess.**  If the Council does not approve or disapprove the proposed rules, in whole or in part by resolution within this 45-day review period, the proposed rules shall be deemed approved.  **The rules shall not take effect until approved or deemed approved by the Council.**
>
> (a-1)  **Notwithstanding the provisions of subsection (a) of this subsection, the Mayor may amend the provisions of subsection 3107.18 of Title 12A of the District of Columbia Municipal Regulations (12A DCMR § 3107.18),** including the specifications, drawings, limitations, and requirements of the Illustrations, as defined in subsection 3107.18.11 of Title 12A of the District of Columbia Municipal Regulations (12A DCMR § 3107.18.11), **by rulemaking pursuant to § 2-505, without submission of the proposed rules to the Council for its prior review and approval.**

D.C. Code § 6-1409 (emphasis added).

The interpretation of a statute begins with its plain text, and proceeds to its legislative history and purpose only when the text is ambiguous.  *See Labat-Anderson, Inc. v. United States,* 346 F. Supp. 2d 145, 151 (D.D.C. 2004) (citing *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, (2004)). The plain language of this statute could not be clearer.

*First*, section (a) expressly states that the Mayor may issue rules in whole or in part pursuant to subchapter one of chapter five of title two (D.C. Code §§ 2-501 to 2-511.[6]  The very next sentence of the statute says "the proposed rules shall be submitted to the Council," no matter what section of the District's administrative procedure is used.  The final sentence of the section states that "rules shall not take effect until approved or deemed approved by the Council."  The plain reading of this section is that the Mayor could promulgate rules via emergency rulemaking and forego the statutory notice and comment period in D.C. Code § 2-505(a), but the Council must nonetheless review them.

---

[6]      The emergency rulemaking authority is contained in D.C. Code § 2-505.

*Second*, to make this point even clearer, section (a-1), which was adopted in 2004,[7] specifies the *only* circumstance in which the Building Code may be amended without Council review under D.C. Code § 2-505(c), and limits that amendment to a specific section *not at issue in this case.* Section 3107.18 of title 12 of the D.C.M.R. regulates signage in Gallery Place. *See* 52 D.C. Reg. 835 (Feb. 4, 2005).

A plain language reading of the statute reveals that the District may not amend the general provisions of the Building Code without Council review. The neighbors' reading of the statute's plain language is further buttressed by the application of two additional well-known canons of statutory construction: statutes shall be construed so that each word is given meaning; and more specific, later-in-time enactments control earlier, more general enactments to the extent of any inconsistency. The illegality of the emergency rulemaking is inescapable.

## B. The Rule Against Surplusage Renders the Emergency Rulemaking Invalid

If the District's representations to the Court that an emergency rulemaking can be used to amend *any* provision of 12 D.C.M.R. § 101 *et seq.*, are correct, then of the Gallery Place exception to D.C. Code § 6-1409 is meaningless. It is, of course, a "'cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker,* 533 U.S. 167, 174 (2001)).

Prior to 2004, when subsection (a-1) was added, section 6-1409(a) simply stated that *all* rulemaking amendments to any part of the Building Code were subject to a 45-day waiting period. *See* 51 D.C. Reg. 8945 (Sept. 17, 2004) (adding subsection (a-1) to section 6-1409). If the District's reading of section 6-1409 were correct, addition of the Gallery Place exception in

---

[7]     [52 D.C. Reg. 835 (Feb. 4, 2005).

2004 would have been completely redundant and unnecessary. The addition of that section indicates that the Council was quite aware of its ability to review, revise, and reject the Mayor's proposed amendments to the Building Code, and it delegated only a very narrow portion of its legislative authority to the Mayor. *See* D.C. Code § 6-1409 (a-1); 51 D.C. Reg. 8945. If this emergency rulemaking is valid, then the Gallery Place exception in subsection (a-1) (and the plain language of section (a)) are completely meaningless. That cannot be correct.

### C.   The Emergency Rulemaking Conflicts With a More Specific, Later-in-Time Provision that Restricts the Rulemaking Authority of the Mayor

Section 6-1409's specific commands cannot be overridden by the general provisions in the District's Administrative Procedure Act for an additional reason. It is a settled principle of statutory interpretation that where there is a conflict between the provisions of two different statutes, the statute enacted later in time controls and constitutes an implied repeal of the earlier statute to the extent of the conflict. *E.g.*, *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 154 (1976); *Posados v. Nat'l City Bank*, 296 U.S. 497, 503 (1936). Moreover, insofar as a conflict between the terms of two statutes exists, a more specific statute controls over a general one. *E.g.*, *Brown v. GSA*, 425 U.S. 820, 834-35 (1976); *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) (citing cases); *Townsend v. Little*, 109 U.S. 504, 512 (1883).[8]

The District relies on section 2-505(c) of the D.C. Code for the power to promulgate its emergency rulemaking, according to an email courteously sent to the neighbors' counsel on June

---

[8]     The neighbors do not concede, of course, that any such conflict exists, as a lawful change could be performed via emergency rulemaking under D.C. Code 2-505(c) *and* prompt Council action.

2, 2006.[9]   This provision was enacted in 1968 and is part of D.C.'s Administrative Procedure

Act.  82 Stat. 1206 (1968).   The provisions of section 6-1409(a) and (b) (quoted above),

however, were enacted as part of the Building Code in *1987*, and the Gallery Place exception

was added in *2004*.  51 D.C. Reg. 8945 (Sept. 17, 2004) (adding subsection (a-1) to section 6-

1409); 34 D.C. Reg. 1072 (Mar. 21, 1987) (enacting 1987 version of Building Code, which

included language effectively identical to sections 6-1409(a) & (b) in section 10).  Therefore,

because section 6-1409 is both a later-in-time enactment and a more specific statute, any conflict

between the terms of the two rulemaking provisions should be resolved in favor of the

applicability of section 6-1409.[10]  *Cf. Jubilee Hous., Inc. v. D.C. Water & Sewer Auth.*, 774 A.2d

281, 283 (D.C. 2001) (invalidating emergency rulemaking by WASA because, although valid

emergency existed under § 2-505, emergency rulemaking controverted more specific statute

governing WASA that required public hearings and comments).

All the neighbors ask of their government is that it follow the law, whether it be the law

of the First Amendment or the District's own organic rules of governance.  The neighbors

respectfully remind the Court that, at the June 2 status hearing, when the neighbors attempted to

bring the language and exception in D.C. Code § 6-1409 to the Court's attention, the District

represented that this emergency rulemaking endured several layers of review, and that the

---

[9]        The provision reads as follows:

   Notwithstanding any other provision of this section, if, in an emergency, as determined by the Mayor or an
   independent agency, the adoption of a rule is necessary for the immediate preservation of the public peace,
   health, safety, welfare, or morals, the Mayor or such independent agency may adopt such rules as may be
   necessary in the circumstances, and such rule may become effective immediately.  Any such emergency
   rule shall forthwith be published and filed in the manner prescribed in subchapter III of this chapter.  No
   such rule shall remain in effect longer than 120 days after the date of its adoption.

D.C. Code § 2-505. The provisions of § 2-505 were enacted in 1968 as part of D.C.'s Administrative Procedure Act,
and they apply generally to the rulemakings by all of D.C.'s executive agencies.  *See* D.C. Code § 2-505; 82 Stat.
1206 (1968).

[10]        The neighbors do not concede that any such conflict exists.

9

neighbors' suggestion regarding the procedural legality of this rulemaking was "frivolous."[11] This rulemaking also formed the basis for the Court's delay of an immediate hearing on the merits of plaintiffs' motion for a preliminary injunction.  The text of section 6-1409 makes it inescapably clear that the Council must review any emergency action while in session, and either actively or constructively approve any changes.  The illegality of the emergency rulemaking is both obvious and indisputable, and plaintiffs' motion for a preliminary injunction should be granted. [12]

### D. The District Must Define the "Emergency" that Exists

The District's attempt to invoke the emergency rulemaking procedures under 2-505 fails for another reason, in that it insufficiently defines the emergency that it seeks to address.  The emergency rulemaking procedure under section 2-505 represents an extraordinary departure from the normal separation of powers principles that govern the District.  According to the D.C. Code, emergency regulations may take effect without notice to anyone, and solely on the Mayor's authority. D.C. Code § 2-558(b).  Due to the extraordinary nature of the emergency rulemaking power, this Court has made clear that section 2-505 does not give the Mayor a blank check to amend rules whenever he wishes.  There must be an actual "emergency" in order for the rulemaking process in § 2-505 to be validly exercised.  In ***Wheelchair Carriers Ass'n v. D.C.***, 2002 U.S. Dist. LEXIS 4617 (D.D.C. 2002)**,** the Court invalidated a change in the Medicaid reimbursement rate for wheelchair transports as not being "__necessary__ for the immediate preservation of the public peace, health, safety, welfare, or morals."  *Id.* at *6 (citing D.C. Code

---

[11]    Indeed, the District initially represented that it was prepared to respond to this argument in 24 hours.

[12]    This is a supplemental brief to a motion for preliminary injunction, but summary judgment might nonetheless be proper as the neighbors do not believe any material facts are in dispute.  *See* Fed. R. Civ. P. 65(a)(2).

§ 2-505) (emphasis added).  The District's attempt to characterize the situation here as emergent is equally flawed.

> The District has characterized the problems with the Building Code as follows:
>
> Emergency rulemaking is necessary to clarify the applicability of the sign regulations to signs bearing non-commercial statements of fact, belief, or personal or political opinion posted on private property.  The current building code regulations are ambiguous and could create uncertainty concerning the legal requirements for posting these signs.  The adoption of this emergency rulemaking allows the public to receive immediate guidance on the manner in which they may use signs on private property to express themselves on non-commercial personal and political matters."

Emergency Rulemaking at 1.

The District cannot have it both ways. The neighbors do agree that the chilling effect of facially unconstitutional regulations, or regulations that are unconstitutional as applied to large swaths of District residents under the First Amendment, might constitute an "emergency" due to the harm caused to critical free speech interests.  *Wheelchair Carriers* makes clear, however, that bald allegations of an "ambiguity" that "could" create uncertainty are insufficient to warrant the "necessary" use of D.C. Code § 2-505, which allows regulations to take effect without notice to the public or give the public an opportunity to comment.  *See Wheelchair Carriers,* 2002 U.S. Dist. Lexis 4617, at *9 ("Were the budgetary concern  evidenced by the meager record in this case sufficient to justify invocation of the emergency rule-setting procedures, then any budget shortfall would presumably justify emergency rate adjustments for any program in the District of Columbia without public notice or review.") (internal quotation omitted).[13]  By parity of reasoning, the District may not amend its Building Code without notice and comment (particularly when violations of those regulations are subject to substantial fines and jail time, see D.C. Code § 6-1406) merely because it believes those regulations are "ambiguous" and

---

[13]    The neighbors, for example, had no opportunity to review or comment on the emergency rulemaking before it allegedly took effect.

"could" in some cases be construed to prohibit activity that the regulation was not intended to prohibit. Such assertions cannot constitute an "emergency" as a matter of law.

The District's pre-existing regulations, which were the subject of the neighbors' initial attack are not "ambiguous" in any relevant sense: they are vague, content-discriminatory and overbroad, for the reasons set forth in the neighbors' initial Memo in Support. On their face they prohibit broad swaths of protected speech on residential property and city-wide.By purporting to exercise the "emergency rulemaking" power in section 2-505, the District has conceded that its pre-existing signage regulations are unconstitutional, in which case the neighbors agree that an "emergency" might exist. If, however, it contends that the pre-rulemaking regulations are constitutional, then there is no "emergency" and no call for the Mayor's unilateral action. *Cf. Wheelchair Carriers,* 2002 U.S. Dist. Lexis 4617, at *9.

In the end, however, the procedural validity of the emergency rulemaking is almost irrelevant, as it cannot be enforced. The emergency regulation is facially unconstitutional.

## II. The Amended Sign Regulations Violate the First Amendment

The neighbors appreciate the effort that the District expended in revising the Building Code in a short time frame. Nonetheless, a review of the new provisions reveals that the relevant provisions of the Building Code remain impermissibly content-discriminatory, vague, overbroad, and subject to a standardless permit requirement. [14] The new regulation states: "[e]xcept as otherwise specifically provided, Section 3107 shall not apply to signs bearing non-commercial

---

[14] Counsel wishes to be clear that he by no means intends to denigrate the effort that counsel for the District clearly exerted to get an emergency rulemaking promulgated—given the seven-year delay between filing and decision in *Armstrong v. D.C. Pub. Library*, 154 F. Supp. 2d 67 (D.D.C. 2001) (Sullivan, J.) and the inertia of bureaucracies in general; she had to move mountains. The reality is, however, that the bureaucracy cannot solve these problems. Only the Council can.

statements of fact, belief, or personal or political opinion posted on private property."
Emergency Rulemaking, at 1. The rulemaking then goes on to incorporate that specific language
into several sections of section 3107. *See id.* at 1-3. Neither "commercial," nor "non-
commercial" is defined.

At the outset, the neighbors stress once again that they do not contend (and have never
contended) that the District is powerless to enact *content-neutral* time, place and manner
restrictions with respect to signage on public property. Nor do they suggest that their First
Amendment rights as property owners permit them to hire out their front yards to Phillip Morris
for the erection of tobacco billboards. *Cf. City of Ladue v. Gilleo,,* 512 U.S. 43, 57 n.15, 59 n.17
(1994). What the neighbors object to in this case is the overbreadth and content-discrimination
contained in the emergency rulemaking, particularly (but not solely) as it pertains to speech on
residential property. A constitutional regulation of signage in residential zones might say, for
example, that "All outdoor signs in residential zones measuring over 16 square feet in area shall
require a permit," and then be subject to an objective permit procedure that provides quick access
to judicial review.[15] Such a scheme would be easy to enforce, content-neutral, helpful in
preventing undue visual clutter, and, in the overwhelming majority of cases, constitutionally
bulletproof.

Instead, the District has created a needlessly complex and bizarre system of speech
regulation—permitting the erection of vaguely defined "non-commercial" signs of virtually
unlimited size anywhere in the city on private property, whether sponsored by the individuals,
property owners, or corporations, or persons other than the property owner. *See* Emergency
Rulemaking at 1*; cf. Ladue,* 512 U.S. at 59 n.17 (suggesting that a regulation of commercial, off-
site advertising would receive a lower amount of First Amendment protection). In contrast, a

---

[15] The scheme might also prohibit property owners from renting out their front yards as advertising space.

resident wishing to put up a simple yard sale sign cannot legally do so (see § 3701.9.1), on pain of fines, jail time, and the potential denial of future permits for home improvement projects. *See* D.C. Code §§ 6-1406, 6-1407.3. Even if the invocation of section 2-505 were procedurally valid, the amended sign regulations still suffer from fatal First Amendment defects, and their chilling effect is no less than the ones that existed previously.

### A. The Emergency Rulemaking is Content-Discriminatory

Amended section 3701.1 discriminates on the basis of content, and is facially unconstitutional. "The government may impose reasonable restrictions on the time, place and manner of engaging in protected speech *provided that they are adequately justified without reference to the content of the protected speech.*" *Cincinatti v. Discovery Network,* 507 U.S. 410, (emphasis added); *see also Armstrong,* 154 F. Supp. 2d at 75-76 (Sullivan, J.). *Discovery Network* disposes of this case. There, the publishers of commercial handbills had their permits to distribute their products in news racks revoked and they sued the city of Cincinnati on First Amendment grounds. *See 507 U.S.* at 413-14. In addition to ruling that the city's statute was an impermissible restriction on the publishers' First Amendment right to engage in commercial speech, the Supreme Court struck down the statute as content-discriminatory. *See id.* at 430. The ordinance at issue in that case stated:

> No person shall throw or deposit any commercial or non-commercial handbill in or upon any sidewalk, street or other public place within the city. Nor shall any person hand out or distribute or sell any commercial handbill in any public place. Provided, however, that it shall not be unlawful on any sidewalk, street or other public place within the city for any person to hand out or distribute, without charge to the receiver thereof, any non-commercial handbill to any person willing to accept it, except within or around the city hall building.

*Id.* at 414 n.3. [16]

---

[16]     "Commercial handbill" was defined as

The purported justification for the newsrack restriction in *Discovery Network* was safety and aesthetics.  *See id.* at 429.  The Court nonetheless struck down the ban, stating:

> Regardless of the *mens rea* of the city, it has enacted a sweeping ban on the use of newsracks that distribute "commercial handbills," but not "newspapers."   Under the city's newsrack policy, whether any particular newsrack falls within the ban is determined by the content of the publication resting inside that newsrack.  Thus, by any commonsense understanding of the ban, the ban in this case is content-based.

*Id.* at 429.

From a First Amendment standpoint, amended section 3701.1 is far worse than the unconstitutional ban in *Discovery Network*, which applied only to <u>public</u> space.  In order to determine whether a sign on private property requires a permit, the code official must determine, in each of the amended sections, whether each sign is "non-commercial*,*" and then whether it is a statement of "fact, belief, or personal or political opinion."  For example, a sign in a person's yard— "SAVE OUR PROPERTY VALUES—NO MCMANSIONS," "YARD SALE SATURDAY—PROCEEDS TO SUPPORT OUR VETS," "NO BLOOD FOR OIL. BUY A PRIUS," or "SUPPORT UNIONS: SHOP AT SAFEWAY"—contains both political and commercial components, and section 3701.1 by its terms forces the code official to make content-based distinctions between signs both in section 3701.9.1 (governing residential zones)

---

"any printed or written matter, dodger, circular, leaflet, pamphlet, paper, booklet or any other printed or otherwise reproduced original or copies of any matter of literature:

"(a) Which advertises for sale any merchandise, product, commodity or thing; or

"(b) Which directs attention to any business or mercantile or commercial establishment, or other activity, for the purpose of directly promoting the interest thereof by sales; or

"(c) Which directs attention to or advertises any meeting, theatrical performance, exhibition or event of any kind for which an admission fee is charged for the purpose of private gain or profit." Cincinnati Municipal Code § 714-1-C (1992).

*Discovery Network*, 507 U.S. at 414 n.2.  This regulation gives no such guidance.

and elsewhere.  In the alternative, suppose that a resident wished to hang a vintage Coca-Cola sign on their front porch.  Is that art?  Or is it commercial speech and prohibited?  In each instance, the code official would have to make a number of distinctions based on the content of each individual sign.  *Discovery Network* makes clear that laws or regulations permitting governmental officials to make such distinctions are content-discriminatory, and constitutionally impermissible.

Moreover, the distinction between "commercial" and "non-commercial" that the District has made bears no rational relationship to any content-neutral interests in traffic safety and aesthetics.  In *Discovery Network*, the Court found that the ban on the distribution of commercial handbills through newsracks, but permitting "newspapers" to be so distributed had no relationship to the content-neutral interests of safety and aesthetics.  *See* 507 U.S. at 429-30.  The same is equally true in this case.  A resident may put up a "non-commercial" sign of unlimited size with attendant aesthetic and safety risks, but "yard sale" signs are completely banned (see 3107.9.1), or "commercial" signs bearing political messages are limited to one square foot, and cannot appear within 18 inches of a window.  *See* 12 D.C.M.R. §§ 3107.3, 3107.3.5.4.  The decision to limit one kind of sign and allow other kinds of signs of virtually unlimited size belies any claim that the District might have to a content-neutral justification for its emergency regulation, and renders it facially invalid.

### B. The Emergency Rulemaking is Unconstitutionally Vague

In addition to content discrimination, the District's emergency regulations contain two other First Amendment defects: its operative provision is unconstitutionally vague and it contains a standardless permit requirement.  *See Discovery Network,* 507 U.S. at 423 n.19.  The District's regulatory  scheme depends on a governmental determination as to whether a particular sign

contains "non-commercial" speech, and raises the same concerns as the newsrack ordinance struck down in *Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988). The ordinance at issue in *Lakewood* vested in the mayor authority to grant or deny a newspaper's application for a newsrack permit, but contained no explicit limit on the scope of the mayor's discretion. The Court struck down the ordinance, reasoning that a licensing scheme that vests such unbridled discretion in a government official may result in either content or viewpoint censorship. *Id.* at 757, 769-770.

As *Discovery Network* notes, the distinction between a "commercial" statement of "political belief or personal opinion," and a "non-commercial" statement of political belief or personal opinion hardly shimmers with clarity. *See Discovery Network,* 507 U.S. at 423 n.19. Unlike the Cincinnati ordinance at issue in *Discovery Network,* however, the emergency rulemaking contains no definition of "commercial," much less a definition of "non-commercial." *Cf id.* at 414 n.2 (giving tripartite definition of "commercial handbill").

The District's regulations give the code official considerably less guidance than the statue at issue in *Discovery Netowrk*. Under the revised Building Code, the code official's responsibility for distinguishing between the two carries with it the impermissible ability to discriminate between favored and disfavored subjects. *See id.* at 423 n. 19*; Lakewood,* 486 U.S. 750. *See also Metromedia, Inc. v. San Diego*, 453 U.S. 490, 536-537 (1981) (Brennan, J., concurring in judgment) (ordinance which permits governmental unit to determine, in the first instance, whether speech is commercial or noncommercial "entail[s] a substantial exercise of discretion by a city's official" and therefore "presents a real danger of curtailing noncommercial speech in the guise of regulating commercial speech"). *Cf. Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 230 (1987) ("In order to determine whether a magazine is subject to

sales tax, Arkansas' enforcement authorities must necessarily examine the content of the message
that is conveyed . . . . Such official scrutiny of the content of publications as the basis for
imposing a tax is entirely incompatible with the First Amendment's guarantee of freedom of the
press") (internal quotation marks and citation omitted).  The very same DCRA that would not
issue permits for the most basic kind of First Amendment activity has expressed public concerns
over the "mixed messages" of campaign signs and protest signs (see Memo in Support Ex. F
(Washington Post Article); see also Memo in Support at 4-7 (describing the neighbors' quixotic
efforts to obtain permits from DCRA), will have to determine whether or not each "SUPPORT
UNIONS – SHOP AT SAFEWAY" sign is a permissible "non-commercial statement of fact,
belief or personal or political opinion."   The exercise of bureaucratic discretion over the content
of First Amendment activity is the very reason for the existence of the First Amendment's
vagueness doctrine, and that doctrine prevents the exercise of the breadth of discretion seen here.

## C. The Emergency Rulemaking is Subject to a Standardless Permit Requirement

Although the permit requirement in section 3701.9.5.1 was repealed, the vague permit
requirement in section 3701.6.7 remains. "When a licensing statute allegedly vests unbridled
discretion in a government official over whether to permit or deny expressive activity, one who
is subject to the law may challenge it facially." *Lakewood,* 486 U.S. at 755.[17]  Like the
newspaper ordinance struck down in *Lakewood,* this provision of the Building Code is "directed
narrowly and specifically at expression or conduct commonly associated with expression." *Id.* at
760.  That provision states:

---

[17]      *See also Thornhill v. Alabama,* 310 U.S. 88, 97 (1940) ("One who might have had a license for the asking
may . . . call into question the whole scheme of licensing when he is prosecuted for failure to procure it.").

> **Special Permits.**  The code official is authorized to issue a permit to erect and maintain a sign not conforming with this Section[18] if the code official finds that such sign or conditions surrounding such sign are **unusual in character, of a type infrequently encountered, and that approval of the permit** will provide an equitable application of this Section **basically in keeping** with its purpose and intent.  The code official in each such special permit is authorized to impose such terms and conditions **as he or she may deem necessary**.

12 D.C.M.R. § 3107.6.7 (emphasis added) (as amended by emergency rulemaking).

The number of impermissible content-based judgments required by this provision is breathtaking.  The code official *may* (but need not) issue a permit if the sign is "unusual," "infrequent" or "basically in keeping" with the purpose and intent of the code.  *Id.*  It might as well mention "objectionable" in appearance.  See *Armstrong*, 154 F. Supp. 2d at 69.  By making the permit dependent on whether the sign is of a type "infrequently encountered," or "unusual in nature" for example, the speaker's rights depend entirely on the code official's subjective judgments.  The code official may also add whatever conditions to the permit he wishes and has no time period in which he must grant or deny the permit, in direct violation of *Lakewood* and other long-standing cases.  *See* 486 U.S. at 759; *see also, e.g., Cox v. Louisiana, 379 U.S. 536*, 553-54 (1965); *Freedman v. Maryland,* 380 U.S. 51, 59-60 (1965) (requiring submission is a prior restraint).

### D. City of Ladue v. Gilleo, 512 U.S. 43 (1994), Prevents the District from Banning Yard Sale and Other "Commercial" Signs in Amended 3107.9.1

Even assuming *arguendo* that the District's amended regulations are content-neutral and sufficiently specific, their application to residential property still violates the First Amendment.

---

[18]    It is unclear whether the word "Section" refers to section 3107 as a whole, or just 3107.6, as it is used both ways.  *See* 12 D.C.M.R. §§ 3701.3 ("Section"); 3107.3 (applying "Section" to real estate signs); 3107.9.1 ("Section").  That ambiguity, however, makes no difference to the resolution of this case.

That result is mandated by *City of Ladue v. Gilleo,* 512 U.S. 43 (1994)*,* which invalidated a municipal ordinance that banned signs, except for certain exceptions, that did not apply to the plaintiff. A statute prohibiting "speech of private citizens on private property or in a traditional public forum is presumptively impermissible, and this presumption is a very strong one." *Ladue,* 512 U.S. at 59 (O'Connor, J., concurring).

*Ladue* instructs that, because of the special status of the home in civil liberties jurisprudence, the court should inquire *first, on a content-neutral basis,* whether the government "may properly *prohibit*" signs on residential property, and then, "only if necessary" determine whether it was improper for the City to *allow* certain other signs. *Id.* at 54 (emphasis in original). *Ladue* makes clear the power of the District to categorically *prohibit* residential signs of any kind does not exist. The reason for this rule is that the applicable government interests in traffic safety that apply in signage cases are virtually eliminated when the government seeks to regulate signage on private property, as "individual residents themselves have strong incentives to keep their own property values up and to prevent visual clutter in their own yards and neighborhoods—incentives markedly different from those of persons who erect signs on others' land, in others' neighborhoods, or on public property." *Id.* at 58-59. That lack of power simply does not depend on whether or not such residential signage is commercial.

For purposes of analysis under *Ladue,* there is no functional difference between a wholesale ban on signs and a permit requirement that bans only some signs unless those signs are authorized first via a permit. *Ladue* controls this case, and makes clear that the power to *ban* residential signs *of any stripe* is lacking in the first instance. *See* 512 U.S. at 58. Nonetheless, that is precisely the power that the amended District regulations purport to exercise. Section 102.1 of the Building Code (12 D.C.M.R. § 102.1) states that specific and more restrictive

provisions control if two provisions govern the same conduct; the neighbors therefore begin their analysis with the most restrictive provision that applies on residential property. 12 D.C.M.R. § 3107.9.1.

### 1.    Section 3107.9.1 Remains Overbroad

Section 3107.9.1, which governs signage in residential districts, now states:

"No sign or signs shall be permitted in any Residential District except signs bearing non-commercial statements of fact, belief, or personal or political opinion, unless a permit is issued by the code official in accordance with this section."

Exception: A permit shall not be required for a nameplate not exceeding 1 square foot in area, to advertise a home occupation, *and* bearing only the name and occupation of the occupant of the building."

*Id.* § 3107.9.5.1 (emphasis added). As a result, yard sale signs of *any size* are now illegal, and subject to the severe enforcement provisions in D.C. Code § 6-1406, unless a permit can be obtained under the vague permit provisions discussed above. Not only are these signs illegal, but no permit procedure exists by which they can get one save the vague procedure in section 3107.6.7. The District's amended regulations *still* assume—wrongly—that the government has the power to ban these signs in the first instance. The city's lack of a greater power to ban the signs completely under *Ladue* forecloses their ability to selectively ban yard sale or other signs containing both commercial and non-commercial messages without a permit, and renders section 3701.9.1 unconstitutionally overbroad. *See Ladue,* 512 U.S. at 56-59; *cf. also Pica,* 907 F. Supp. at 802 (describing variance procedure as no more than an unconstitutional prior restraint on free speech). If section 3701.9.1 is struck down as unconstitutional, the next most severe provision is amended section 3701.3.

### a) Section 3107.3 Burdens too Much Speech

Even assuming content-neutrality, amended section 3107.3 implies that all "commercial" signs greater than one square foot in area require a permit unless exempted. *See* 12 D.C.M.R. §§ 3107.3, 3107.3.5 (exemptions).   People who put up yard sale, or other signs have a right to have their messages (even commercial ones) understood and read by pedestrians and passing traffic. One square foot is not sufficiently large to attract attention from passing cars or pedestrians, particularly when the permit number and date of issuance must be displayed in inch-high lettering. *See* 12 D.C.M.R. § 3107.5.

The incoherent scheme of exemptions to section 3107.3's permit requirements reflect the influence of certain constituencies within the membership of the Building Code's private drafters and not any rational state interest in visual clutter.  The ability of building firms and other groups to place signs up anywhere in the District destroys any credible government interest in limiting even commercial residential signs to such a size. *See Ladue*, 512 U.S. at 52, 58-59 (discussing effect of exceptions and reduced government interest in visual clutter); *see also id.* at 49; *Pica,* 907 F. Supp. at 800; *Knoeffler,* 87 F. Supp. 2d at 327.[19]

For example, real estate signs placed by an agent (not the property owner) up to six square feet in area need no permit or government review whatsoever, no matter how the property in which they appear might be zoned, who wishes to display them, or how they are displayed. *See id.* § 3107.3.5.7; *see also* D.C. Code § 42-1801 (granting permission to post temporary real

---

[19]     Unlike the ordinance in *Ladue*, however, which contained findings regarding the municipality's interests in traffic safety and controlling visual clutter, the Building Code and its enabling legislation make *no* express reference to traffic safety or aesthetics. *Compare Ladue,* 512 U.S. at 47 (quoting express findings regarding aesthetics and safety and traffic hazards), *with* D.C. Code § 6-1404 (referring only generally to interests in "public safety, health, and welfare by building construction" and "in general, to secure safety to life and property from all hazards incident to the design, erection, repair, removal, demolition, or use and occupancy of buildings, structures, or premises."); 12 D.C.M.R. § 101.2.4 (similar).  Even making the stretched assumption that the interests in preventing visual clutter and controlling traffic (as opposed to the private interests who drafted the code) motivated the regulations, the Building Code does not permissibly advance them.

estate signs on public property with no express size limitation).  Indeed, in terms of traffic

hazards, temporary directional signs to open houses pose significant risks, as drivers looking for

addresses in unfamiliar residential neighborhoods may well pay more attention to street names

than pedestrians.  Such signs, however, do not require permits at all—irrespective of size—even

if they appear on public property.  *See* D.C. Code § 42-1801; 12 D.C.M.R. §§

3107.6.6, 3107.16.4; *cf. Linmark Assoc. v. Township of Willingboro,* 431 U.S. 85, 94-95 (1977)

(invalidating ban on real estate advertising on private property, even when ban designed to

advance substantial interest of racial integration). [20]  Similarly, *any* sign advertising

"nonconforming uses" under the zoning regulations[21] may be up to *40* square feet in area, and

does not require the property owner to produce a plat or a code official to approve the permit

after examining the sign and its location on the property.  *See* 12 D.C.M.R. § 3107.9.1.[22]  These

numerous exemptions, as well as the presence of advertising on buses (*see* Ex.  F) eviscerate any

claims to traffic safety that the government might claim—even with respect to so-called

---

[20]     Variations in the code official's discretion also show the lack of tailoring in the Building Code.  For example, unlike permits for residential yard sales which are discretionary, see § 3107.6.7, "a permit *shall* be issued to erect, hang … or display *any* sign advertising the sale, rent or lease of real estate, or which in *any manner pertains to* land or buildings."  *See* 12 D.C.M.R. § 3107.16.4 (emphasis added).  Similarly, temporary sign permits in residential zones must be issued for signs up to 40 feet in size, even when located in a public place.  *See id.* § 3107.8.  The neighbors' complaint, however, goes to the ability to regulate signs in the first instance under *Ladue*, not on the specific application of any particular provision.

[21]     The zoning regulations define a nonconforming use as:

   any use of land or of a structure, or of a structure and land in combination, lawfully in existence at the time this title or any amendment to this title became effective, that does not conform to the use provisions for the district in which the use is located.  A use lawfully in existence at the time of adoption or amendment of this title that would thereafter require special exception approval from the Board of Zoning Adjustment shall not be deemed a nonconforming use.  That nonconforming use shall be considered a conforming use, subject to the further provisions of §§ 3104.2 and 3104.3.

11 D.C.M.R. § 199.1 (internal citation omitted).

[22]     *See also, e.g., id.* § 3107.9.5.4 (Church bulletins may be as large as 20 square feet and do not require permits before they may be posted); *id.* § 3107.3.5.8  (stating that vacant buildings may display signs); *id.* §§ 3107.3.5.1, 3107.3.5.2 (exempting the changing of matter on billboards or theater bills on "established frames" does not undergo government review before being displayed); *id.* § 3701.3.5.5 (stating that businesses located in commercial zones may display 3 signs of four square feet each without prior government approval).

commercial speech.[23]  The District cannot ban signs under section 3107.1, or limit them to one

square foot under section 3107.3.

### E.  The Permit Requirement Itself Places an Impermissible Burden on the Exercise of First Amendment Rights.

In combination with the language of the amended 3107.1, the District's permit

application process that must take place *before* a "commercial" statement of "political opinion"

can lawfully be displayed under either section 3701.9.1 or 3701.3.1 has an additional

constitutional defect: the burden of compliance impermissibly will prevent many people from

speaking at all:

> It is offensive—not only to the values protected by the First Amendment, but to the very notion of a free society—that in the course of ordinary public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so.  Even if the issuance of permits by the mayor's office is a ministerial task that is performed promptly and at no cost to the applicant, a law requiring a permit to engage in such speech constitutes a dramatic departure from our constitutional tradition.

*Watchtower Bible & Tract Soc'y of New York  v. Village of Stratton,* 536 U.S. 150, 165-66

(2002).

In *Watchtower Bible*, the Supreme Court found that a township could not require

canvassers to obtain permits before going door-to-door and leafleting on public property, an area

where the government's interests in preventing crime or littering are far greater than on private

property.  *See, e.g., id.* at 169 (dismissing crime concern); *Lovell v. Griffin,* 303 U.S. 444, 451-52

(1938) (invalidating leafleting ordinance); *cf. Ladue,* 512 U.S. at 58 (noting diminished interest

---

[23]      The Building Code's provisions arguably leave open even less alternative avenues of communication than the ordinance in *Ladue.*  There, counsel for the city observed that the city's sign ordinance did not inhibit the use of flags or banners as an alternative means of communication.  *Ladue,* 512 U.S. at 58 n.16.  Here, in contrast, the Building Code prevents any "banner, sign or flag used for advertising purposes" from being hung without a permit. 12 D.C.M.R. § 3107.5.  The regulation is silent on whether or not the term "advertising" includes matters of public or neighborhood concern.  Even if the regulation is read to apply only to commercial speech, "the mere possibility that another medium could be used in an unconventional manner to carry the same messages" does not alter the fact that the Building Code has banned a "distinct and traditionally important medium of expression."  *Ladue,* 512 U.S. at 58 n.16.

of government in regulating speech on private property). *Any* permit requirement for a specific

kind of residential sign—much less one that carries the possibility of fines, denial of permits for

future, unrelated construction, and incarceration—will improperly result in a "significant amount

of spontaneous speech that is effectively banned," *Watchtower Bible,* 536 U.S. at 167, and, for

these neighbors, "may well make the difference between participating and not participating in

some public debate." *Ladue,* 512 U.S. at 57.  The government may not regulate speech in this

fashion. *Cf. Lovell v. Griffin,* 303 U.S. 444, 451 (1938) ("Whatever the motive which induced its

adoption, its character is such that it strikes at the very foundation of the freedom of the press by

subjecting it to license and censorship.…  [T]he liberty of the press became initially a right to

publish without a license what formerly could be published only with one.") (internal quotation

and citation omitted); *Kunz v. New York,* 340 U.S. 290, 293-94 (1951); *Saia v. New York,* 334

U.S. 558, 560-61 (1948) (applying *Cantwell* and *Lovell*).  If the government cannot burden

speech via licensing in a *public* forum where its interests in crime prevention, visual clutter and

aesthetics are far higher, it follows that it cannot impose such requirements on residential yard

signs, when its interests are at their lowest point. *Compare, e.g., Ladue,* 512 U.S. at 58

(discussing reduced government interest in private signage regulation); *with Watchtower Bible,*

536 U.S. at 168-69 (striking down permit requirement despite state interest in prevention of

crime and resident privacy); *Lovell,* 303 U.S. at 451 (striking down licensing requirement despite

city's interest in preventing litter). *Cf. Linmark,* 431 U.S. at 94-95 (racial integration not

sufficient interest to ban commercial speech on private property).

For example, assume that a resident wishes to put up a sign that says "YARD SALE

SATURDAY.  HELP SUPPORT OUR VETERANS."  Given the consequences of failing to

comply with the law under D.C. Code sections 6-1406 and 6-140 a prudent citizen will read the

"non-commercial" requirement in amended section 3701.1 to require that she head to DCRA to try to obtain a permit for her yard sale sign on her own property—whether that sign is either over one square foot for purposes of section 3701.3.1, or, as under section 3701.9.1, any size at all.

The burden of compliance with the Building Code's Byzantine provisions—particularly for working people who can all too often ill afford to devote the time and resources needed to do so — is neither "ministerial," "performed promptly," nor free of cost. *Watchtower Bible,* 536 U.S. at 166. For example, the Building Code now requires that a person wishing to place any yard sale sign in their front yard must provide drawings in triplicate, "drawn to scale showing details of construction dimensions, lettering, and method of attachment of the sign." *Id.* § 3107.3.1. In addition, the application must state the width of premises or width and height of the building, or any other dimensions deemed necessary by the code official to determine the allowable area of the sign. *Id.* § 3107.3.2. The cost of obtaining a required plat of the property is $30, and the neighbors waited approximately four business days. (*See* Gustitus Aff. ¶ 12; Parenti Aff. ¶ 7.)

The neighbors' experience demonstrates the extraordinary burdens that permit requirements place on speech, and, as discussed above, the numerous exceptions to the permit requirements belies any reason for singling out residential signs for prohibition. *Cf. Ladue,* 512 U.S. at 57 n.15. The effect of the District's requirements on Ms. Todd's First Amendment rights is obvious. Agreeing with the views of her neighbors, Ms. Todd nonetheless refrained from speaking upon hearing about her neighbors' receipt of the NOVs and their burdens in negotiating the city bureaucracy. (Todd Aff. ¶¶ 4-9, 13-14.) If these regulations are upheld, Ms. Parenti, Ms. Gustitus, and Ms. Ramoy, who have collectively spent several frustrating and futile hours trying to get a permit, would simply be compelled to abstain from making their views known,

despite their strong feelings on the zoning issue.  (Gustitus Aff. ¶¶ 7-21, 23-24; McBride Aff. ¶¶ 7-12; Ramoy Aff. ¶¶ 7-9, 11-12; Parenti Aff. ¶¶ 7-11.)   Considerable amounts of protected speech will be stifled as a result of the statute's vague ban on "commercial" statements of political belief.  The principles enunciated in *Ladue, Lovell* and *Watchtower Bible* firmly prohibit the government from requiring the neighbors to obtain its permission before posting yard sale or other commercial signs on their own property.

### F.  *To Avoid Further Confusion, 24 D.C.M.R. § 108 Should Be Unambiguously Declared to Apply Only To Public Places, Not Residential Ones.*

The neighbors note that nothing that the District has done in its emergency rulemaking has in any way affected their challenge to 24 D.C.M.R. § 108.  Out of an abundance of caution, the neighbors respectfully ask this Court to enjoin the application of this regulation to private property.  *See* 24 D.C.M.R. § 108.  The DCRA's public statement that the District's municipal regulations allow for campaign signs (and only campaign signs) on private property (see Ex. F) is incorrect.   Given this public misstatement that section 108 does apply to residential signs, as well as what seems to be considerable confusion within the District government regarding the applicability of the Building Code (see Parenti Aff. ¶ 7), the chilling effect of  this regulation is inescapable.

Critically, as written, the District's regulations permitting the display of campaign signs in certain circumstances do not apply to displays on private property.  Chapter one of title 24, entitled "Occupation and Use of *Public* Space" (emphasis added) governs the placement of political campaign signs on *public* property—specifically lampposts.  *See* 24 D.C.M.R. § 108 5(a), (b); *see also id.* § 100 (describing mayor's authority over the use of public space).   Section 108.1 states that no advertisements or signs may be affixed to public lampposts except in

accordance with the section.  *Id.* § 108.1.  These are the relevant provisions in the District, and despite DCRA's comments to the contrary, there are no other provisions on the books that allow for the display of campaign signs on residential property. [24]

## III.   The Signage Scheme Violates the Neighbors' Rights to Equal Protection Under the Law

In addition to violations of the First Amendment, under the Equal Protection Clause, both the emergency rulemaking and the pre-existing Building Code violate constitutional guarantees of equal protection under the law.[25]  Under the Equal Protection clause,

> There is an "equality of status in the field of ideas," and government must afford all points of view an equal opportunity to be heard.  Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say.  Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone.

*Carey v. Brown*, 447 U.S. 455, 463 (1980).  *Ladue* mandates that the "forum" of private property is open to every citizen on a content-neutral basis prohibiting state action. "Speech of private

---

[24]    If construed beyond "public lampposts," see 24 D.C.M.R. 108.1, section 108's application to the neighbors' yard signs would be constitutionally barred.  The neighbors note that if  "a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided," the court's "duty is to adopt the latter."  *See Harris v. United States*, 536 U.S. 545, 555 (2002).  First, the categorical ban in this provision cannot be constitutionally applied to the neighbors' yard signs under *Ladue.  See* 512 U.S. at 53 (noting that inquiring into permissible exemptions from a categorical sign ban is of no use to a speaker if her speech is not exempted); *see also, e.g., Arlington County Republican Party v. Arlington County,* 983 F.2d 587, 595 (4th Cir. 1993) (striking down sign limitations on private property); *Fehrbach v. City of Troy,* 341 F. Supp. 2d 727, 731 (E.D. Mich. 2004) (striking down 2-campaign sign limit).  Second, by its terms, section 108.5 favors campaign signs (of any size) and "crime prevention" signs (of any size), and bans protest signs completely - immediately raising the specter of content discrimination.  *See McFadden v. City of Bridgeport,* 2006 U.S. Dist. Lexis 13348, at *2 (N.D. W. Va. Mar. 20, 2006), *Discovery Network, supra*.  The regulations are plainly unconstitutional; however, this Court need not necessarily resolve these issues to grant the neighbors the relief they are seeking because these campaign sign regulations simply do not apply to the residential signs at issue here.  Ms. Argo's statements in Exhibit F and the neighbors' experience suggests that the District may, however, be selectively enforcing its sign regulations under section 3107 based on the content of the message in those signs. (*See also* Todd Aff. ¶¶ 6-10).

[25]    Constitutional guarantees of Equal Protection apply to the District via the Fifth Amendment's due process clause.  *See Bolling v. Sharpe*, 347 U.S. 497 (1954).

citizens on private property or in a traditional public forum is presumptively impermissible, and this presumption is a very strong one." *Ladue,* 512 U.S. at 59 (O'Connor, J., concurring).

Here, however, the District has discriminated against residents from erecting "yard sale" as well as other far less commercial signs on their own property, where its interests are at their constitutional nadir, but has permitted a variety of other speech, even when it occurs off of the speaker's property.  As originally enacted or as amended via emergency rule, the Building Code's regulation of residential signage is not sufficiently related to its legitimate state interest in visual clutter, and is unconstitutional.  *See Carey,* 447 U.S. at 461-470; *see also, e.g., Metromedia,* 453 U.S. at 511-512 (noting critical difference between "onsite" and "offsite" advertising); *Ladue,* 512 U.S. at571 n.15, 59 n.17 (making the same distinction).

## CONCLUSION

For all the foregoing reasons, the neighbors' motion for a preliminary injunction should be GRANTED.

Respectfully submitted,

On: _____          By: _____/s/_____
                                     Christopher A. Mohr
                                     D.C. Bar No. 458599
                                     Michael R. Klipper
                                     D.C. Bar No. 166074

                                     Meyer, Klipper & Mohr, PLLC
                                     923 Fifteenth Street, NW
                                     Washington, DC  20005
                                     Voice:  202-637-0850
                                     Fax:  202-637-0851