# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LINDA GUSTITUS, ET AL., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 1:06-cv-00814-EGS |
| | ) |
| ANTHONY WILLIAMS, ET AL. | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFFS' REPLY TO THE DISTRICT'S SUPPLEMENTAL OPPOSITION TO PLAINTIFFS MOTION FOR PRELIMINARY INJUNCTION

## INTRODUCTION

The unconstitutional incursion on First Amendment freedoms wrought by the signage regulations go well beyond statutory "ambiguity," but a discussion of them appears nowhere in the District briefs. The District has never—in any written document or at oral argument—denied that it lacks the power to prosecute the neighbors, only that it was an "error" to do so. It does not discuss overbreadth, vagueness, content-neutrality, or the merits of *any* First Amendment test, much less its regulations' failure to comply with them. Despite its best efforts, the District has replaced a vague, content-discriminatory, and facially unconstitutional regulation with—a vague, content-discriminatory and facially unconstitutional regulation that was illegally adopted. The fact that the District

has professed that it will not enforce its regulations against signs that *it determines* are of an "ideological or expressive character" (Defs.' Reply Br. to Pls. Mot. Challenging Defs.' Emergency Rulemaking in Supp. of Their Mot. for a Prelim. Inj. (hereinafter "District Reply Brief") at 1)—whatever that may mean—misses the point entirely.  The neighbors have alleged that the District lacks the *power* to make such determinations in its signage regulation, and it is the exercise of such discretion that the First Amendment plainly prohibits.

The District is struggling mightily to hang on to that illegal discretion. The emergency rulemaking was presented to the neighbors and the Court as *fait accompli,* without any opportunity for meaningful review to see whether it has addressed their concerns before promulgation.  Now that the neighbors have reviewed those regulations, and demonstrated their facial and procedural invalidity, it claims that this court lacks *jurisdiction* to review those contentions. Recission of the NOVs and its effort to enact the emergency rulemaking notwithstanding, the District's legal position reflects an inexplicable indifference to the neighbors'—and District residents'—First Amendment rights to free speech and of access to the courts.  The legal posture of this case is in the exact same place that it was when it was filed, and the neighbors' motion for preliminary injunction should be granted.[1]

## SUMMARY OF ARGUMENT

---

[1]    Given the exhaustive briefing that has gone on in this case, this could be consolidated to a judgment on the merits as no facts are in dispute.

First, under longstanding Supreme Court precdent, the nighbors have standing to challenge the District's signage laws.  These decisions recognize, for example, that "when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license."  *City of Lakewood v. Plain Dealer Publ'g*, 486 U.S. 750, 755-756 (1988).   As the neighbors' declarations detailing their interaction with the District reveal, the instant case is far more than one in which a required permit is not sought before a constitutional challenge is proffered.  The District commenced action against the neighbors and, when it did so, it put the constitutionality of its signage regulations directly at issue.  Moreover, as a matter of law, the neighbors stand in the shoes of every other resident in the city.  The presence or absence of a class action is irrelevant to the standing question as the coercive effect of the Building Code's civil and criminal enforcement provisions creates First Amendment injury.  The neighbors are properly before this Court challenging the District's vague, facially unconstitutional permit scheme.

As to defendant's claim of mootness, they have failed to satisfy their heavy burden of demonstrating that this case is moot.  Significantly, the District cannot point to a single case in which a federal court has held that it lacked jurisdiction over a proper First Amendment challenge without first reviewing the statute that corrected the alleged constitutional wrong.  Indeed, even *repeal* of an

offending statue does not necessarily moot the grant of a preliminary injunction. *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 288-89 (1982).  With the exception of one provision, 12 D.C.M.R. 3107.6.3 ("miscellaneous signs"), no such repeal has taken place.

The defendants' suggestions that the neighbors cannot question the propriety of its emergency rulemaking and that this "Court need not and should not consider the propriety of defendants' emergency rulemaking in this case," (District Reply Brief at 5) are similarly defective.  As to the former, claims under 42 U.S.C. § 1983 do not require an exhaustion of state or administrative remedies. Turning to the latter claim, in a case remarkably similar to the instant one, the United States Court of Appeals for the District of Columbia has rejected the argument that a plaintiff's constitutional claims should be dismissed for lack of jurisdiction because the D.C. Administrative Procedure Act (D.C. APA) vests exclusive jurisdiction for the review of administrative action in the D.C. Court of Appeals.  *Dist. Props. Assocs. v. District of Columbia*, 743 F.2d 21, 22-23 (D.C. Cir. 1984).  Moreover, the doctrine of constitutional avoidance mandates that the validity of the rulemaking be decided before the constitutional issues can even be addressed.  In this case, the statutory validity of the rulemaking is a threshold matter to be addressed before the neighbors' First Amendment claims because the former determination could serve to avoid constitutional issues.

The arguments proffered in defense of the Mayor's alleged authority to issue the emergency rulemaking are similarly unavailing.  The District's proposed

construction of the emergency rulemaking provisions is belied by its own

regulatory practice.  Moreover, the authorities cited by the defendants do not

support their contention that the Council's past legislative practices justify its

invocation of the emergency rulemaking authority.  In fact, one of the two

statutory schemes relied on by the District, D.C. Code § 34-1206, was ***repealed***

almost four years ago—a fact that the District does not disclose.  49 D.C. Reg.

7334 (Aug. 2, 2002).  The defendants' assertion of the validity of the mayor's

emergency rulemaking cannot be saved by the bald assertion that "proposed rule"

is not a term of art under the laws of the District; there is simply no basis for

drawing a distinction between "proposed rules" and "emergency rules."  Also,

defendants' reliance on the canon *expressio unius est exclusio alterius* to justify

its reading of section 6-1409 is misplaced, in part because it cannot be employed

to contradict the plain language of the statutory text which here mandates the

contrary reading.

## ARGUMENT

# I.  Article III Jurisdiction Exists in this Case

In blunt terms, the District has misstated the law of federal jurisdiction.

In its brief, it states that "plaintiffs lack standing to challenge the emergency

rulemaking."  (District Reply Brief at 2.)  *Standing* is not, and has never been, at

issue in this case.  Standing is determined *based on the allegations (and, in this*

*case, declarations) in the complaint.  Haase v. Sessions*, 835 F.2d 902, 908 (D.C.

Cir. 1987).  Moreover, in First Amendment cases, standing requirements are also

5

relaxed because of the importance of free speech interests.   The Supreme Court

has consistently permitted "attacks on overly broad statutes with no requirement

that the person making the attack demonstrate that his own conduct could not be

regulated by a statute drawn with the requisite narrow specificity." *Bigelow v.*

*Virginia,* 421 U.S. 809, 815-16 (1975).  Thus, for example, the Supreme Court

has stated that "our cases have long held that when a licensing statute allegedly

vests unbridled discretion in a government official over whether to permit or deny

expressive activity, one who is subject to the law may challenge it facially without

the necessity of first applying for, and being denied, a license." *Lakewood,* 486

U.S. at 755-56.  "When a licensing statute allegedly vests unbridled discretion in a

government official over whether to permit or deny expressive activity, one who

is subject to the law may challenge it facially." *Id.* at 755.  The existence of

overbroad laws—particularly ones with criminal penalties, see D.C. Code 6-1406,

cause harm *by virtue of their very existence.   See, e.g., Bigelow*, 421 U.S. at 815-

16. [2]  The District's contentions to the contrary are without merit.

---

[2]       The cases that the District cited on standing are utterly inapposite.  *Laird v. Tatum*, 408
U.S. 1 (1972), denied standing because all the plaintiffs had alleged was that the government was
collecting information about them and that the collection of that information *might* be misused.
The court was careful to distinguish between *that* defective allegation based on plaintiffs'
subjective fear that the government "might in the future take some *other* and additional action
detrimental to that individual," and the cases where plaintiffs did have standing based on the
objective "exercise of governmental power [that] was regulatory, proscriptive, or compulsory in
nature, and the complainant was either presently or prospectively subject to the regulations,
proscriptions, or compulsions that he was challenging."  *See id.* at 11-14.  Similarly, in *City of Los
Angeles v. Lyons*, 461 U.S. 95 (1983), the Court held that there was no standing to seek an
injunction against police officers applying chokeholds in non-life-threatening situations based
solely on plaintiff's subjective fear "that he would again be stopped for a traffic violation, or for
any other offense, by an officer or officers who would illegally choke him into unconsciousness
without any provocation or resistance on his part."  *Id.* at 105.  The Court, however, made clear
that there would be standing if "the City ordered or authorized police to act in such a manner." *Id*
at 106.  Here, in contrast, if this case is dismissed, the neighbors (and every other resident) must

First, this is far more than a case in which a plaintiff challenges a permit scheme without first applying for the required authorization. The District commenced proceedings against the neighbors for First Amendment protected conduct under regulations that are facially unconstitutional—a point that the District has never defended. Its spokespeople defended that action unapologetically in the press. (*See* Ex. F.) The neighbors spent hours at DCRA unsuccessfully trying to obtain permits, and their experience demonstrates with clarity the dangers of such vague, content-discriminatory, and overbroad regulations. Even after negative press coverage of the District's actions on the front page of the Metro section, DCRA neither granted nor denied their requests for hearings, much less rescinded their citations. Its bureaucracy continued to remain indifferent both to the neighbors' counsel's pre-litigation request for a stay of administrative action until the neighbors had a chance to meet with DCRA to present their First Amendment concerns, and to his offer to work collaboratively on revision and repeal of the offending provisions.[3]  Now that it is under this Court's watchful eye, it takes the position that it was an "error" to prosecute the

_____

attempt to comply with a law they have alleged is unconstitutional. The other cases cited by the District are even farther off-point. *E.g., Whitmore v. Arkansas*, 495 U.S. 149, 152-53 (1990) (denying standing to inmate to challenge conviction of third party that had legally waived all rights to appeal his death sentence); *Nat'l Maritime Union of Am. v. Military Sealift Command*, 824 F.2d 1228, 1235 (D.C. Cir. 1987) (wage dispute, standing denied).

[3]        See Pls.' Memo. in Supp. of Pls.' Mot. For Prelim. Inj. at 8 n. 7 (detailing pre-litigation efforts). In addition, on or about April 5, prior to the commencement of this suit, counsel for the neighbors also attempted to get the D.C. Council's attention, and contacted multiple Council members. One Council member's chief of staff expressed some reticence to get involved because the Building Code was drafted by a national body. Neither of these Council members nor their staff has expressed at any time any inclination to repeal these regulations.

neighbors. Poor judgment, however, is not a defense to federal jurisdiction or injunctive relief. More importantly, nothing the District has done resolves the neighbors' principal complaint that the District lacked the *power* to prosecute them—or *any one else*—under the challenged regulations in the first place. The coercive effect of the laws remains.

Second, for the purposes of deciding a facial challenge under the First Amendment, the neighbors stand in the shoes of every other resident in the city. The presence or absence of a class action is entirely irrelevant. *E.g., Lakewood*, 486 U.S. at 755-56; *Bigelow,* 421 U.S. at 815-816. Here, the District has promulgated what the neighbors have alleged is a vague, content-discriminatory and facially unconstitutional permit scheme and replaced it with one that is facially unconstitutional for almost the exact same reasons. We could find no case refusing to enjoin such laws or regulations absent their complete and unequivocal repeal. That has certainly not occurred here.

The neighbors therefore expressly reject any suggestion that the District's rulemaking has somehow allayed their First Amendment concerns or otherwise clarified "the issue plaintiffs complain of." (District Reply Brief at 1).[4] The District's reliance on its emergency rulemaking fails to take into account that—as the Supreme Court has recognized—the line between commercial and non-

---

[4]     The neighbors note that implicit in many of the District's arguments is that the neighbors are somehow at fault because they have pressed their case despite recission of the NOVs. Any such implicit (or explicit) suggestion is both irrelevant and unfair. The neighbors have done nothing except ask their government to follow the law. One could just as easily ask why, despite multiple offers from the neighbors' counsel, the District has refused to enter a consent decree with respect to these regulations and eliminate the chilling effect they cause, as opposed to fighting fruitless battles over jurisdiction.

commercial speech is very hard to draw, even when the legislation defines the operative terms, which the District did not. *See City of Cincinnati v. Discovery Network,* 507 U.S. at 410, 423 n.19 (1993) (suggesting that the challenged statute was vague despite inclusion of definitions); *id.* at 430 (holding ordinance content-discriminatory and unconstitutional). The emergency rulemaking is vague, because a person of ordinary intelligence would have to guess at its meaning. *See Armstrong v. D.C. Pub. Library,* 154 F. Supp. 2d 67, 81 (D.D.C. 2002).

The amended regulation exempts only signs bearing "non-commercial statements of fact, belief, or personal or political opinion posted on private property." Every neighbor has sworn under oath that at least part of their motivation had to do with property values, land sale, and split-lot development—decidedly "commercial" concerns that the government could easily view as falling on the commercial, rather than non-commercial, side of the line. (*See, e.g.,* Gustitus Aff. ¶ 3; McBride Aff. ¶ 3; Parenti Aff. ¶ 3; Ramoy Aff. ¶ 3; Todd Aff. ¶ 6-7). Indeed, this entire dispute began as a reflection of the neighbors' displeasure with the sale of land for split-lot development. The neighbors, and every other District resident, are now at the mercy of District inspectors who will determine whether or not their signs are of an "ideological or expressive character." (District Reply Brief at 1.)

Therefore, many of the same defects that the neighbors pointed out in their very first Memo in Support still exist. *Cf., e.g.,* 12 DCMR § 3107.6.7 (as amended) (still giving discretion to deny permit for "unusual," "infrequently

9

encountered" signs).   The neighbors have standing to bring their claims, are
likely to succeed on the merits, and the District should be enjoined.

### A. The Question is Mootness, not Standing.

Standing in this case exits; the issue is whether this case is *moot* because
the District has voluntarily rescinded its NOV's.  Mootness is a *narrow* exception
to standing, and the District bears the "heavy burden" of demonstrating it.
*Friends of the Earth, Inc. v. Laidlaw Envtl. Srvs. (TOC), Inc.,* 528 U.S. 167, 189
(2000).  The District has done nothing to meet that burden. As laid out in detail in
the neighbors' prior filings, voluntary cessation of illegal conduct cannot moot a
request for injunctive relief, as then the injunction could never be reviewed on
appeal, and the defendant would be free to return to its old ways. (*See* Pls.' Reply
to Defs.' Opp'n to Pls.' Mot. for a Prelim. Inj. at 3.)

The District can point to no federal court holding that it lacked jurisdiction
over a First Amendment challenge without first reviewing the statute that
corrected the alleged constitutional wrong.  Indeed, even *repeal* does not
necessarily moot the grant of a preliminary injunction.  For example, in *Aladdin's
Castle*, the plaintiff brought a First Amendment challenge to the constitutionality
of a permit scheme based on the municipality's denial of a permit. *See Aladdin's
Castle*, 455 U.S. at 287.  The Supreme Court held that the plaintiff's claim for a
preliminary injunction was not moot even though the municipality had *repealed*
the offending provision.  *Id.* at 288.  A court must review a challenged regulation
to ensure that it complies with the demands of the First Amendment and redresses

10

a plaintiff's grievances in full.  Here, that is not the case.  (*See* Pls.' Supplemental Mem. of P. & A in Resp. to the Emergency Rulemaking by the District of Columbia and in Supp. Of Pls.' Mot. For Prelim. Inj. At 12-28); *see also Laidlaw,* 528 U.S. at 193-94 (injunction not mooted despite the fact that defendant had closed plant, and left the state).  Therefore, the District's arguments regarding this Court's jurisdiction are patently incorrect.

### B.  Administrative Exhaustion is Not Required in § 1983 Cases

The District does not seem to be anywhere near as concerned with defending the constitutionality of its regulations and their effect on First Amendment rights as it is with preserving its bureaucracy's power to issue rules without accountability.  On page five of its Reply Brief, it states that the D.C. APA "places exclusive jurisdiction to review agency action in the D.C. Court of Appeals," and that the neighbors cannot question the propriety of its emergency rulemaking under section 6-1409.  (District Reply Brief at 5.)  It then states that "this Court need not and should not consider the propriety of defendants' emergency rulemaking in this case."  *Id.*  Those suggestions are breathtakingly wrong.

First, to the extent that the District is suggesting that the neighbors must exhaust administrative remedies under the D.C. APA before this court has jurisdiction to review its rules—emergency or otherwise, that suggestion is nonsense.  Claims under 42 U.S.C. § 1983 do not require an exhaustion of state or

administrative remedies.  *Monroe v. Pape*, 365 U.S. 167, 183 (1961); *Brown v. United States*, 742 F.2d 1498, 1510 (D.C. Cir. 1984) (holding D.C. Code § 12-309 inapplicable to § 1983 claims); *see also Pica v. Sarno*, 907 F. Supp. 795, 800 (D.N.J. 1995) (administrative exhaustion not required in First Amendment cases). Tomorrow, any plaintiff in the city could bring a First Amendment challenge against the emergency rulemaking, and this Court would have jurisdiction to hear it.

Second, the doctrine of constitutional avoidance mandates that the statutory validity of the rulemaking be decided before the constitutional issues can even be addressed.  "[W]hen a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter."  *Harris v. United States*, 536 U.S. 545, 555 (2002) (internal quotation omitted).  Applying that canon, the statutory validity of the rulemaking is a threshold matter to be addressed before the neighbors' First Amendment claims because the former determination could serve to avoid constitutional issues.  Were the Court to decide otherwise, it would be insulating the Mayor's power to enact rules without notice from judicial review at the expense of the Council's legislative power.  It may be in the Mayor's interest to take such a position, but it is not the in the Council's.[5]  Therefore, not only does the court have jurisdiction to hear the neighbors' challenge to the validity of the emergency rulemaking, but the issue of

---

[5]      In contrast, if the Court skips the statutory construction issue and proceeds directly to constitutionality, the Mayor retains power to enact rules without notice, comment, or foundation. The Council loses either way.

the rulemaking's validity bears directly on the maintenance of the separation of powers in the District.

Third, the D.C. Circuit has already considered the effect of the D.C. APA on section 1983 claims, and rejected the exact same argument that the District makes here. In *District Properties Associates,* the D.C. Circuit *reversed* a district court dismissing a 1983 case for lack of jurisdiction on the basis that the D.C. APA vested exclusive jurisdiction for the review of administrative action in the D.C. Court of Appeals. 743 F.2d at 25. In holding that the District Court erred in its jurisdictional conclusion, *id.* at 26, the court stated:

> The appropriate mode of analysis is to determine whether, if the District of Columbia were a state and the D.C. APA a state statute, a federal court would exercise jurisdiction over the case. . . . A state statute establishing that a federal Section 1983 plaintiff has a remedy available in state court (which is the effect of the relevant section of the DC APA) could not act to bar an otherwise appropriate action under Section 1983, for **there is no requirement that plaintiffs in Section 1983 cases exhaust state remedies before bringing their suits in federal court**. . . . It follows that the D.C. APA is not a bar to appellants' attempt to bring this cause of action in federal court.

*Id.* at 27 (emphasis added) (internal citations and quotation omitted).

No case cited by the District deviates from this authority. In *Robinson*, the court dismissed plaintiff's D.C. APA claim for lack of jurisdiction only *after* plaintiff's federal § 1983 claim had already been dismissed on other grounds and no other federal claims remained. *Robinson v. Palmer*, 841 F.2d 1151, 1157 (D.C. Cir. 1988). Similarly, in the *Lightfoot* case, the D.C. Circuit remanded the case to the District Court for reconsideration of its *supplemental* jurisdiction over

the D.C. APA claim only *after* reversing that court's decision on the federal

claims. *Lightfoot v. District of Columbia*, No. 05-7028, 2006 U.S. App. LEXIS

12597, at *14-16 (D.C. Cir. May 23, 2006).[6] The statutory construction issues of

section 6-1409 are inextricably intertwined with the adjudication of the neighbors'

First Amendment rights, and, under ordinary rules of constitutional interpretation,

should be considered first.  This Court clearly has both original and supplemental

jurisdiction to review the procedural validity of the emergency rulemaking in the

context of an action under 42 U.S.C. 1983.  It is to the construction of that section

that the neighbors now turn.

## II.    The Mayor Does Not Have the Power to Issue the Emergency Rulemaking Under D.C. Code § 6-1409

The District's explication of the Mayor's authority to promulgate the

emergency rulemaking is mistaken.  Contrary to the District's claims, the Mayor

has no "inherent authority to issue rules and to address emergencies as part of the

executive power," and the statutory provision cited by the District, D.C. Code § 1-

204.22 (District Reply Brief at 9), makes that point abundantly clear.  Section 1-

---

[6]      It should be noted that the language quoted in defendants' brief—"a federal district court . . . does not have comparable authority; it cannot, for instance, remand a case to a state agency, thereby acting in a supervisory capacity" (District Reply Brief at 5)—was quoted out of context. *Id.* at *14.  With this quote, the court was merely pointing out that the remedies available to a plaintiff challenging administrative action in a federal court in the context of a § 1983 claim differ from the remedies that would otherwise be available in the D.C. Court of Appeals.  *Id.*  The court was emphasizing this point because the District Court in that case has exceeded its remedial authority by remanding the case to an administrative agency and ordering the agency to conduct a rulemaking.  *Id.* at *8-9.  This point is made clear by a sentence in the same paragraph as the language quoted by defendants, in which the court emphasizes that it "does not mean that a federal court lacks authority to entertain a claim under § 1983 that would also be cognizable as a DCAPA claim to the D.C. Court of Appeals."  *Id.* at *16.  The District's suggestion to the contrary is disingenuous at best.

204.22 states that "The Mayor is authorized to issue and enforce administrative orders, not inconsistent with this or any other Act of the Congress or any act of the Council, as are necessary to carry out his functions and duties."  This provision certainly authorizes the Mayor to act, *but only in ways that are consistent with the law.   Cf. Jubilee Hous., Inc. v. D.C. Water & Sewer Auth.,* 774 A.2d 281, 283 (D.C. 2001).  Surely the Mayor is not arguing that he is "Commander in Chief" of the District and may disregard those acts of the Council with which he disagrees.  The sole question before this Court is whether or not the *Council* authorized these purported amendments to the Building Code without its review.  It plainly did not.

### A. The District's Proposed Construction of Section 6-1409 is Tortured and Illogical

The neighbors have argued that the plain language of D.C. Code § 6-1409 prohibits amendments to the Building Code without Council review.  The touchstone of the District's response is that that the term "'proposed rule' is a term of art under District law," legally distinct from "the discrete and separate term, 'emergency rule.'"  (District Reply Brief at 6.)  It then offers a series of justifications for its reading of that term.  Each of those justifications is incorrect.

### 1. The District's Proposed Construction is Belied by Its Own Practice

The District's proposed construction is belied by its own regulatory practice, which has followed the clear demands of D.C. Code § 6-1409 in all but

one recent instance.  The District cites no authority for its statement that "use of differing language has not generally been construed to contradict the Council's longstanding practice of providing the Mayor with broad rulemaking powers and of not restricting the Mayor's ability to take time-limited rulemaking action in emergencies."  (District Reply Brief at 9.)  The District's own regulatory practice proves the opposite, and confirms the neighbors' position.

Since the original version of the Building Code was enacted in 1987, it has been amended ten times.  In *nine* of those instances amending various provisions of the Building Code, the proper rulemaking procedures (after a Council review period, as specified in section 6-1409(a)) were followed.[7]  In contrast, there is only one other instance of an emergency rulemaking amendment to provisions of the Building Code other than section 3107.18.  52 D.C. Reg. 1324 (Feb. 11, 2005) (amending sections 105, 113, and 114).  Clearly, compared with the large number of proper Building Code amendments, this aberrant and unchallenged emergency rulemaking cannot be evidence of the legislative intent to grant such emergency rulemaking authority or of the lawfulness of the rulemaking at issue here.

---

[7]     *See* 52 D.C. Reg. 4900 (May 27, 2005) (amending 12 D.C.M.R. §§ 105A (Permits), 113A (Violations and Infractions), & 114A (Stop Work Order)); 51 D.C. Reg. 3267 (Mar. 26, 2004) (correcting errors in prior rulemaking adopting the Construction Codes Supplement of 2003); 51 D.C. Reg. 1894 (Feb. 20, 2004) (correcting errors in prior rulemaking adopting the Construction Codes Supplement of 2003); 51 D.C. Reg. 292 (Jan. 9, 2004) (adopting the Construction Codes Supplement of 2003); 47 D.C. Reg. 7695 (Sept. 22, 2000) (adding new subsections 3115.4.2 through 3115.4.2.10 regarding the permit application required for the display of sponsored, outdoor wall signs); 46 D.C. Reg. 9410 (Nov. 19, 1999) (adopting the Construction Codes Supplement of 1999); 39 D.C. Reg. 8665 (Nov. 27, 1992) (adopting the Construction Codes Supplement of 1992); 37 D.C. Reg. 5889 (Sept. 7, 1990) (amending numerous provisions in 12 D.C.M.R. §§ 111 & 123 regarding street numbering of buildings); 35 D.C. Reg. 6305 (Aug. 19, 1988) (amending 12 D.C.M.R. §§ 102.5 & 103.5 regarding the minimum distance between two exit doors).

## 2.  The Statutes Relied on by the District Undercut Its Construction of 6-1409

The Council's general legislative practice also does not authorize the District's rulemaking in this case.  In support of its proposed construction, the District states that "the Council historically has used varying language to authorize rulemakings," and suggests that the Building Code is just another regulatory enactment.  (District Reply Brief at 7.)    Neither of the two statutory sections cited in support of this position, D.C. Code §§ 34-1206 and § 8-101.06, supports their position.

First, D.C. Code § 34-1206 was ***repealed*** almost four years ago, a fact that the District's brief does not disclose.  49 D.C. Reg. 7334 (Aug. 2, 2002).  It is evidence of nothing except that the Council elected not to maintain the procedure it contained.

Second, D.C. Code § 8-101.06 simply does not support the District's position.  Like D.C. Code § 6-1409, section 8-101.06 contains both a broad provision for environmental rules that are subject to a 45-day Council review period, and another provision that that exempts rulemaking procedures under section 2-505.[8]  The crucial difference between the two statutes, however, is that

---

[8]     *Compare* D.C. Code §§ 8-11.06(b) ("The proposed rules shall be submitted to the Council for a 45-day period of review"), *and* 8-11.06(c) ("The Mayor may also issue or amend *any rule* needed to implement the provisions of this subchapter pursuant to subchapter I of Chapter 5 of Title 2 [i.e., § 2-505].  Rules issued pursuant to this subsection are not subject to the 45-day Council review period"), *with* D.C. §§ 6-1409(a) ("The proposed rules shall be submitted to the Council for a 45-day period of review") *and* 6-1409(a-1) ("notwithstanding the provisions of subsection (a) of this subsection, the Mayor may amend the provisions of subsection 3107.18 of Title 12A of the District of Columbia Municipal Regulations (12A DCMR § 3107.18)…by rulemaking pursuant to § 2-505, without submission of the proposed rules to the Council for its prior review and approval.").

the exception to Council review in section 8-101.06(c) applies broadly to "any rule," whereas the exception in section 6-1409(a-1) narrowly applies only to rules "amend[ing] the provisions of subsection 3107.18" of the Building Code. Therefore, far from supporting defendants' argument, defendants' citation of section 8-101.06 actually supports the neighbors' contention that the emergency rulemaking has exceeded the statutory authority of the Mayor and the DCRA. *Compare Jubilee Hous.*, 774 A.2d at 283.

Third, the District fails to note a key distinction between the regulations in the Building Code and the pollution regulation in section 8-101.06. The Council has delegated responsibility for drafting its Building Code to a *private entity*, see D.C. Code § 6-1409(b), whose draft regulations are then submitted to the Council for review. It makes sense that, as the District's legislative representatives, the Council would retain, in all cases, the right to review any changes to that Code. Even here, despite Council review, the original unconstitutional regulations were slipped into law in hundreds of pages of text. Legislative oversight is therefore critical.

### 3. "Proposed Rule" is Not a Term of Art.

There is no distinction between "proposed rules" and "emergency rules" in the Definitions section of the D.C. APA, which speaks only in terms of "rules." D.C. Code § 2-502(6)(A) (defining "rule" as "the whole or any part of any Mayor's or agency's statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or to describe

the organization, procedure, or practice requirements of the Mayor or of any agency.").  Second, the sole section that the District cites in support of this proposition, D.C. Code § 2-505, does not even use include the literal phrase "proposed rule."  Section 2-505 speaks only of "rules," using the same term when referring to rules promulgated after being "proposed" to, and adopted by, the Council, and to rules promulgated in emergency situations.  Therefore, there is absolutely no support for defendants' bald assertion that "'proposed rule' is a term of art" under the D.C. APA.

### 4.  The *Expressio Unius* Maxim Is Inapplicable.

Defendants' second argument is that the maxim *expressio unius est exclusio alterius* confirms that section 6-1409 applies only to proposed rules and not to emergency rulemakings.  (District Reply Brief at 6-7.)  Defendants' argument seems to be that, because section 6-1409 contains the words "proposed rulemaking" but does not contain the words "emergency rulemaking," it must only apply to the former.  This reading is incorrect for a number of reasons.

First, the *expressio unius* maxim should not be used to contradict the plain language of the statutory text.  *Pauley v. BethEnergy Mines*, 501 U.S. 680, 703 (1991); *Orlando Food Corp. v. United States*, 423 F.3d 1318, 1325 (Fed. Cir. 2005) ("the maxim expressio unius est exclusio alterius is not useful when its application would produce a result that is inconsistent with the plain language of the statute").  Here, section 6-1409 does refer to "proposed rulemakings," but it also contains an express exception in subsection (a-1), and this exception

specifically refers to section 2-505, which contains the emergency rulemaking provisions.  This maxim hurts the District's position, it does not help it.[9]

Second, defendants' reading of the statute completely ignores the fact that section 6-1409 is more specific and was enacted later-in-time than section 2-505. (*See* Pls.' Supplemental Mem. of P. & A. in Resp. to the Emergency Rulemaking by the District of Columbia & in Supp. of Pls.' Mot. for Prelim. Inj. at 8-10).  In order for the District to be correct, section 6-1409 could not mean what it says.

### 5.  The Neighbors' Construction Leaves No Gap in Authority.

The neighbor's construction of section 6-1409 leaves no gap in authority. The District nonetheless argues that its interpretation of the statutory text is preferable, as a policy matter, because the neighbors' reading allegedly would result in a "gap in authority whereby neither the Mayor, nor the Council would be able to amend the Construction Codes on an emergency basis."  (District Reply Brief at 7-9.)  The statute creates no such gap.

The Council is empowered to respond quickly to emergency situations either by adopting a resolution or by passing an emergency act, both of which can take effect immediately upon Council approval after a single reading.  D.C. Code § 1-204.12(a).  In fact, the Council used their emergency powers to respond to a Building Code emergency regarding Gallery Place in late 2004, which added the

---

[9]     Indeed, the case cited by defendants in support of their *expressio unius* argument notes that "this maxim is often misused."  *Shook v. D.C. Fin. Responsibility &Mgmt. Assitance Auth.,* 132 F.3d 775, 782 (D.C. 1998).  In that case, the court used the *expressio unius* maxim to *contradict* plaintiffs' argument that vague and general statutory language authorized a broad grant of rulemaking authority to an executive officer.  *Id.*at 782-783.

Gallery Place exception in section 6-1409(a-1).[10]  Both before and during this litigation, the neighbors have contacted two members of the D.C. Council in an effort to resolve the current dispute via emergency Council action, but the Council members did not respond.  This lack of action on the part of the Council, however, can hardly be taken as an unavoidable "gap" in governmental authority created by the neighbors construction of the statutory language.  If the Council meant to exclude emergency rulemakings from the notice requirement in section 6-1409, it would have said so.

### 6.  The Precatory Language in Section 6-1409(a) is Irrelevant

Defendants' final argument is that general language in the opening sentence of section 6-1409 somehow grants the Mayor broad emergency rulemaking powers.  (District Reply Brief at 8.)  The opening sentence of section 6-1409(a) states, "All future amendments, supplements, and editions of the

---

[10]    The exception to the 45-day review period found in subsection (a-1) of D.C. Code § 6-1409 and the associated provisions in 12 D.C.M.R. § 3107.18 were enacted in late 2004 to address the problem that the outdoor signs, marquees, and digital screens on the MCI (now Verizon) Center at Gallery Place were in technical violation of the Building Code despite an agreement between the owners of Gallery Place and the District of Columbia allowing such outdoor displays.  *See* 51 D.C. Reg. 8945 (Sept. 17, 2004).  To address this problem quickly, the D.C. Council passed an Act in August 2004 pursuant to the emergency legislation provision in D.C. Code § 1-204.12, which allows the legislature to pass laws upon a 2/3 vote without a second floor read or the 13-day waiting period between floor reads, but the laws only remain in effect for 90 days.  51 D.C. Reg. 8945 (Sept. 17, 2004).  While the permanent legislation was pending, the Council passed another similar emergency Act in 2004.  51 D.C. Reg. 9608 (Oct. 15, 2004).  The permanent legislation was finally approved by the Council at the end of 2004 and signed by the mayor in early 2005, but it was not scheduled to take effect for a few months.  52 D.C. Reg. 835 (Feb. 4, 2005).  To fill the gap between the end of the prior emergency legislation and the effective date of the permanent legislation, the legislature used the 90-day emergency legislation power twice more in early 2005 to re-enact the same provisions.  52 D.C. Reg. 3031 (Mar. 25, 2005); 52 D.C. Reg. 1131 (Feb. 11, 2005).  Currently, both the provisions of § 6-1409(a-1) and 12 D.C.M.R. § 3107.18 are on the books pursuant to D.C. Act 15-669.  52 D.C. Reg. 835 (Feb. 4, 2005).  The Council knows how to enact signage legislation quickly if it so desires.

Construction Codes shall be adopted only upon the authority of the government of the District of Columbia." Defendants' reading of this provision is not warranted by the plain language of the statutory text.

This introductory language is merely a general statement of the purpose of this statutory section, and this general language is clarified and limited by the more specific provisions that follow. Again, given that the Building Code was not even drafted by the D.C. Council, but by a private entity representing the building and construction industries (*see* Pls.' Mem. In Supp. for Prelim. Inj. at 9 n.8), it is quite a stretch for the District to claim that this broad, general language contains an implicit authorization of vast, unsupervised, mayoral rulemaking authority. The plain text of the statute and its drafting history belie such an interpretation.

In short, a flurry of briefs notwithstanding, the neighbors are exactly where they were when this case began – subject to an unconstitutional signage scheme. The emergency rulemaking is invalid on both procedural and constitutional grounds.

### CONCLUSION

For all the foregoing reasons, the neighbors' motion for a preliminary injunction should be granted.

Respectfully submitted,

On:   June 23, 2006                              By: _____/s/_____

Christopher A. Mohr
D.C. Bar No.  458599
Michael R. Klipper
D.C. Bar No.  166074

Meyer, Klipper & Mohr PLLC
923 Fifteenth Street, NW
Washington, D.C. 20005
Voice: 202-637-0850
Fax: 202-637-0851